U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 2 1 2017

CLERK, U.S. DISTRICT COURT
By _____ Deputy

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| GWENDOLYN DOLORES RODGERS PATRICK, ON BEHALF OF THE ESTATE OF ALTON RODGERS, DECEASED | § § § § § | Civ. No. 2:16-cv-00216-J<br><br>THIRD AMENDED COMPLAINT |
| *Plaintiff,* | § § § § § § § § § § | (Wrongful Death, Denial, Delay and and Withholding of Medical Care and Deliberate Indifference to Medical and Security Needs, In Violation of the Eighth Amendment; Violation of Right of Access to the Courts; Violations of Title II of the Americans with Disabilities Act and Rehabilitation Act) DEMAND FOR JURY TRIAL |
| v. | § § | |
| STATE OF TEXAS, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER BARRY MARTIN, (FORMER SENIOR WARDEN, CLEMENTS UNIT), in his individual and official capacities, ROWDY BOGGS, in his official and individual capacities, DUSTIN ANDERSON, KAYLA CHAPMAN, JAMIE Y. BURKHOLDER, JASON DORSEY, WILBUR L. KEMPH, MICHAEL W. JACKSON, ISAIAH LOPEZ, JAKOB KELSO, KEVIN MULLINS, T.M. PHILLIPS, PRESTON G. RUSSELL, JULIO LUCERO, JERRY D. GILLIS, JASON A. MOELLER, JONATHAN CROW, CHRISTOPHER J. KYLE, PATRICK M. HAGEMEIER, MARSHALL B. PACE, RAUL BERNAL, KRISTA BARBER, MARIO RANDAL, MANUEL RAMIREZ, J. PEREZ, ZACHARY RAPHAEL, MICHAEL GALBREATH, FERNANDO FRANCO, MARIA CARRIZALES, RN, TAMMY WILLIAMS, LVN, KAREN RAPER, CMA, (aka KAREN BARBER), HELLEN KITCHEN, CMA, ROGER KIEHL, RN, BSN, PEGGY KREIG, LVN, LETICIA DIAZ, LVN, and TRAMESHA RIVERS, LVN, in their individual capacities. *Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

## THIRD AMENDED COMPLAINT

### INTRODUCTION

#### 1.

Alton Rodgers, Decedent (hereinafter referred to as Alton) died while at Northwest Texas Hospital in Amarillo, Texas on January 19, 2016 while in the care and custody of the State of Texas, William P. Clements Unit (hereinafter referred to as TDCJ and Clements Unit) and under the assisted medical care of Texas Tech University Health Sciences Center (hereinafter referred to as TTUHSC). After two years of deteriorating health, Alton was found unresponsive in his bed on January 18, 2016. He was taken to the prison medical facility and then transported to Northwest Texas Hospital where he died. Defendants reported to ambulance crews and healthcare providers at the hospital that Alton was physically assaulted by his cellmate, but offered no details about the severity of the unwitnessed assault or when it allegedly occurred. The same correctional officers also decided against providing hospital caregivers Alton's prior medical history, despite repeated requests for this critical information. When hospital caregivers questioned these correctional officers about why Alton appeared to be in late stages of starvation, they stated with no factual basis that Alton was "purposely trying to starve himself to death." Nowhere in Alton's medical records are "self-starvation" or suicide noted. Finally, the guards told the hospital caregivers that Alton had a history of mental illness and was regularly medicated with drugs. The pathologist who performed Alton's autopsy did so without the benefit of Alton's prior medical history or medical records and opined that Alton died as a result of starvation and due to brain bleeds allegedly sustained in the assault by Mr. Greggs. Eighteen Correctional Officers, administrative staff and/or ranking officers were disciplined by TDCJ because of their deficient conduct relating to Alton's safety, security and medical needs. Internal disciplinary records also confirm that some or all of these Defendants criminally conspired to hide their injurious and criminal conduct by falsifying

government records.  This conduct constitutes multiple criminal felonies in Texas.  While Plaintiff learned that several of the Defendant-guards would be the targets of a grand jury investigation, Plaintiff was then informed that the assigned special prosecutors decided not to take the case to grand jury.  However, subsequent to being informed there would be no criminal prosecution of guards in connection with this incident, Plaintiff learned, through written objections the Office of Investigator General filed, that criminal cases against various guards were still "pending."  This case alleges personal injuries and wrongful death suffered by Alton as a direct and proximate result of Defendants' (correctional officers, healthcare providers and prison administrators) collective and/or individual, deliberately indifferent: a) refusal to provide a safe and secure environment; b) denial, delay and withholding of needed medical care in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and amounting to cruel and unusual punishment; c) violation of the constitutional right of access to the courts; and d) intentional discrimination by reason of Alton Rodgers' mental and physical disabilities in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act. Defendants' acts and/or omissions were intentional and/or carried out with deliberate indifference to Alton's serious medical needs, and in disregard for Alton's mental and physical disabilities, associated with his deteriorating health, including but not limited to extreme malnutrition, starvation, his extensive history of mental illness, and the physical disabilities resulting from the repeated beatings he sustained at the hands of his cellmate.  This is not a medical negligence or "healthcare liability claim."  Therefore, Chapter 74 of the Texas Civil Practices and Remedies Code is not applicable.  Likewise, the qualified immunity provisions of the Texas Tort Claims Act are inapplicable to all State employees named herein below.

### 2.

Alton's Mother, Plaintiff Gwendolyn Dolores Rodgers Patrick, brings claims on behalf of her biological Son's Estate (Alton) for cruel and unusual punishment resulting from denial of

obviously needed security and medical care, personal injuries and wrongful death, violations of the constitutional right to access of the courts, and violations of the ADA and Rehabilitation Act. Plaintiff brings the 42 U.S.C. § 1983 claims against individual employees of TDCJ and TTUHSC in their individual capacities and against certain policy makers for TDCJ and TTUHSC in their official capacities. Plaintiff brings the ADA and Rehabilitation Act claims against the State of Texas, TDCJ and TTUHSC. She brings these claims on behalf of the Estate of Alton Rodgers, who was a United States citizen at the time of his death.

**JURISDICTION & VENUE**

**3.**

Plaintiff's Claims for Relief arise under 42 U.S.C. § 1983 for violations of rights secured by the United States Constitution by person(s) acting under the color of state law, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and the Rehabilitation Act (29 U.S.C. § 794). The Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). Plaintiff seeks damages in excess of $75,000.00, the minimum jurisdictional limits of this Court. Formal written notice of Plaintiff's claims were given to all Defendants via TDCJ officials by Certified Mail. Defendants TDCJ and TTUHSC were partners for purposes of statutory notice requirements. Notice to one partner is effective notice to all partners. All or a part of Plaintiff's causes of action occurred in the Northern District of Texas. At all times material to this Complaint, the Defendants (correctional officers, administrators and healthcare providers) all lived in the Northern District of Texas. All Defendants had actual notice of the nature of Plaintiff's claims, damages and basis of their individual liability contemporaneously with Alton's death, as their respective employer(s) conducted internal investigations of their conduct and advised each of their deficient conduct related to Alton's supervision, welfare, safety and medical needs.

<u>**PARTIES**</u>

**4.**

Alton died on January 19, 2016.  At the time of his death he resided in Amarillo, Texas. He was 31 years old.  He was an African American male. His Estate is represented by his biological mother, Gwendolyn Dolores Rodgers Patrick.  No formal estate proceedings are pending and no administration is required at this time.  There are no other "statutory beneficiaries" as defined by the Texas Wrongful Death and Survival statutes.

**5.**

Gwendolyn Dolores Rodgers Patrick is Alton's biological mother. She is Alton's sole statutory beneficiary under Texas' Wrongful Death and Survival statutes and now acts as the representative of the Estate of Alton Rodgers. At all relevant times, she resided in Dallas, Texas.

**6.**

The State of Texas funds and operates the Clements Unit, and is charged with ensuring that the Clements Unit remains in compliance with federal and state law.  The State of Texas is a recipient of federal funds and has waived sovereign immunity for claims under the ADA and Rehabilitation Act.  The State of Texas is liable under federal laws and the laws of the State of Texas for its own acts and for the acts and omissions of its officers and other employees.

**7.**

The Texas Department of Criminal Justice (TDCJ) is the state prison system and an agency of the State of Texas.  TDCJ is liable under federal laws and the laws of the State of Texas for its own acts and for the acts and omissions of its officers and other employees.  At all relevant times, TDCJ operated the Clements Unit, a public facility with programs and services for which Alton Rodgers was qualified.  TDCJ is a recipient of federal funds, and is sued for compensatory relief under federal law.

**8.**

Texas Tech University Health Sciences Center (TTUHSC) is a component of the Texas Tech University system.  Through its Correctional Managed Care program, TTUHSC partners with TDCJ to provide healthcare for certain TDCJ facilities, including for prisoners at the Clements Unit.  TTUHSC is liable under federal laws and the laws of the State of Texas for its own acts and for the acts and omissions of its officers and other employees.  TTUHSC is a recipient of federal funds, and is sued for compensatory relief under federal law.

**A.      Texas Department of Criminal Justice Employees:**

    **i.) Administrative Supervisors & Policymakers**

**9.**

Barry Martin (hereinafter Martin) is the former Senior Warden of the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107.  He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests, as well as ordering the destruction of material evidence from within Alton's cell.

**10.**

Rowdy Boggs (hereinafter Boggs) is a former Major in charge of correctional officers of the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107.  He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**11.**

Wilbur L. Kemph is a Captain at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107.  He had the duty to ensure safety and

needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**12.**

T.M. Phillips is a Captain at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**13.**

Jason A. Moeller is a Sargent at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**14.**

Julio Lucero is a Sargent at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**15.**

Christopher J. Kyle is a Sargent at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**ii.) Correctional Officers**

**16.**

Dustin Anderson is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 17.

Jamie Y. Burkholder is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 18.

Kayla Chapman is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. She had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 19.

Michael W. Jackson is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 20.

Jason Dorsey is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**21.**

Jakob Kelso is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**22.**

Preston G. Russell is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**23.**

Isaiah Lopez is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**24.**

Kevin Mullins is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**25.**

Jerry D. Gillis is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security

and medical care despite obvious needs and Alton's repeated requests.

**26.**

Marshall B. Pace is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**27.**

Jonathan Crow is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**28.**

Patrick M. Hagemeier is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**29.**

Manuel Ramirez is a Sergeant at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**30.**

J. Perez is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and

needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 31.

Raul Bernal is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 32.

Krista Barber is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. She had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 33.

Mario Randal is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 34.

Zachary Raphael is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

### 35.

Michael Galbreath is a Correctional Officer at the state prison named Williams P. Clements

Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**36.**

Fernando Franco is a Correctional Officer at the state prison named Williams P. Clements Unit of TDCJ located at 9601 Spur 591, Amarillo, Texas 79107. He/she had the duty to ensure safety and needed medical care were provided to Alton, and was involved in denying him safety, security and medical care despite obvious needs and Alton's repeated requests.

**B.**      **Texas Tech University Health Sciences Center Employees:**

     **i.)**      **Prison Nurses & Healthcare Providers**

**37.**

Karen Raper, aka Karen Barber, CMA, is a Certified Medical Assistant at the Clements Unit. She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs.

**38.**

Hellen Kitchen, CMA, is a Certified Medical Assistant at the Clements Unit. She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs.

**39.**

Roger Kiehl, RN, is a Registered Nurse at the Clements Unit. He had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs.

**40.**

Peggy Kreig, LVN, is a Licensed Vocational Nurse at the Clements Unit. She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious

needs.

## 41.

Leticia Diaz, LVN, is a Licensed Vocational Nurse at the Clements Unit.  She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs.

## 42.

Tramesha Rivers, LVN, is a Licensed Vocational Nurse at the Clements Unit.  She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs.

## 43.

Tammy Williams, LVN, is a Licensed Vocational Nurse at the Clements Unit. She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs and Alton's repeated requests.

## 44.

Maria Carrizales, RN, is a Registered Nurse at the Clements Unit. She had a duty to provide medical care to Alton, and was involved in denying him medical care despite obvious needs and Alton's repeated requests.

## <u>BACKGROUND FACTS RELATED TO MEDICAL AND MENTAL HEALTH TREATMENT</u>

## 45.

Alton had an extensive, well-documented history of serious mental illness while in the custody of TDCJ.  Alton was diagnosed at different times throughout his incarceration with psychosis NOS, paranoid schizophrenia, undifferentiated schizophrenia, schizophreniform disorder, schizoaffective disorder, and bipolar disease, all of which required careful monitoring

and ongoing treatment with antipsychotic medication for symptom control. Alton suffered from recurrent episodes often marked by auditory hallucinations and impulse control. When Alton was taking his antipsychotic medications, he was able to successfully control the mental illness.

### 46.

Not surprising of a mental health patient, Alton had a well-documented history of medication compliance issues. The failure to take his prescribed antipsychotic medications commonly led to behavioral problems associated with the diagnosed mental illness. Prior to the fall of 2015, medical and mental health staff responded to such compliance issues through elevated care, including at times in-patient psychiatric hospitalization, and through closer monitoring of Alton's medication intake.

### 47.

During the second half of 2015, Alton began presenting with familiar behavioral problems and medication compliance issues. Dr. Ikechukwu Ofomata, a contract psychiatrist for TTUHSC, saw Alton on August 8, 2015. At that time, Alton complained of hearing voices, and that the voices he heard in the morning told him to "hurt people." Dr. Ofomata ordered bloodwork to see if Alton was taking his antipsychotic medication. After the bloodwork came back negative for the antipsychotic medication, Dr. Ofomata took him off of his medications entirely.

### 48.

On October 20 and 23, 2015 Alton submitted requests to mental health to be seen. Alton asked to again receive his psychotic medications. He explained that he was hearing voices. Despite his complaints of hearing voices, that same day, October 23, 2015, Gerald Granat, a mental health clinician, saw Alton cell-side and, after talking to Alton through a locked cell door, likely in the presence of a cellmate and other inmates, determined that Alton exhibited no signs of psychosis, mania, or other mental health issues.

**49.**

On November 24, 2015, Dr. Ofomata again saw Alton during a "telepsychiatry" encounter. Without conducting a patient history or checking any of Alton's vital signs, and even though Dr. Ofomata was aware of Alton's very recent auditory hallucinations, Dr. Ofomata changed Alton's diagnosis from psychotic disorder or bipolar disorder to intermittent explosive disorder, noting that no evidence of psychosis was present. With this change in diagnosis came a change in medication. Rather than providing Alton with the antipsychotic medication previously prescribed, Dr. Ofomata prescribed Alton Trazadone 50 mg, which is used to treat sleep disorders and mild depression or anxiety.

**50.**

Despite Alton's well-documented history of psychosis, hallucinations and paranoia, the pattern of behavioral problems and medication noncompliance, and Alton's very recent claims to Dr. Ofomata himself that the voices in his head were telling him to hurt people, Dr. Ofomata discontinued Alton's antipsychotic medications and replaced them with something that would not alleviate these dangerous symptoms and hallucinations. Dr. Ofomata therefore decided not to treat Alton's known psychosis. He did this knowing that Alton would suffer from hallucinations and paranoia without being on an antipsychotic mediation, and knowing that Alton would be confined in a cell with another inmate almost every hour of every day. After changing Alton's diagnosis dramatically and stripping him of his antipsychotic medications, neither Dr. Ofomata, Mr. Granat, nor any other healthcare provider followed up with Alton to assess his condition, determine whether his mental illness was effectively treated by the new medication, or to provide any other monitoring or treatment.

**51.**

During the above encounters from October 2015 through November 2015, and in spite of Alton's dramatic and obvious decline in weight, Alton's weight was not taken. Rather, healthcare providers, including Dr. Ofomata, Mr. Granat, LVN Mary Lopez, and RN Donna Tomlinson, simply copied Alton's previous weight (167 pounds) from an earlier encounter. Out of the next approximately 60 days, Alton's cell door was opened on only two days before he was found in a near-death state, weighing as little at 116 pounds.

52.

Also during this same time period, when Alton stopped taking his antipsychotic mediation, Alton submitted numerous requests for medical care for various ailments. From April of 2015 until late September of 2015, Alton submitted over a dozen requests for medical assistance, many for visual issues, and others for headaches and dizziness. Throughout this time period, several of the same healthcare providers saw Alton repeatedly. For example, Physician Assistant Darren Mayer, Registered Nurses Destanie Crady and Judith Thomas, and Licensed Vocational Nurse Tammy Williams saw Alton frequently throughout this time period for similar complaints. Alton's weight was not taken for any of the encounters the healthcare provides had with him during the month of September, 2015.

53.

Rather than acknowledging that many of Alton's health complaints and actions may have been related to a mental health crisis, however, the medical staff dismissed his complaints, apparently concluding that Alton was being dishonest. On one occasion, for example, when Alton was complaining of a loss of vision, and visual disturbances, Defendant Darren Mayer noted that Alton's complaints were "total nonsense," entirely dismissing the very real possibility that Alton, a known mental health patient with a history of hallucinations, was experiencing a mental health crisis.

**54.**

After having made so many requests for medical assistance in the months prior, from September 2015 until the time of his death, Alton's medical chart, like his mental health chart, is void except for use of force documentation. Not one voluntary sick call. Not one entry on his chart, whatsoever. During this 4-month period Alton's weight decreased to as low as 116 lbs, and he became so weak that he was unable to ambulate, or even switch positions while lying in bed. Alton had suffered from irreversible brain damage, severe head trauma and skull fractures as the hours passed with no medical care. Meanwhile, upon information and belief, his cellmate, Joe Greggs, gained 17 lbs. during the final two months of Alton's life [TDCJ Rodgers-839]. Alton became bedridden and developed a 5-inch pressure sore on his hip. On January 18, 2016. His 5-inch pressure sore was severely infected, to the point of becoming odiferous, and he was suffering bilateral bacteria pneumonia.

## BACKGROUND FACTS RELATED TO MONITORING OF ALTON'S CELL

**55.**

During this critical period, when Alton reached a state of advanced starvation, had clearly been bedridden for an extended period of time, and was dying, and after his cellmate gained 17 lbs. over the course of two months, the Defendant correctional officers ignored Alton's clear need for treatment by intentionally failing to perform routine cell checks as required for at least a month. The Defendant correctional officers also failed to perform inmate counts. Upon information and belief, Alton's cell was not opened for 36 consecutive days – from November 30, 2015 to January 5, 2016. [TDCJ Rodgers 002-007]. His cell was then opened on January 5th, and then was not opened again until they found him unresponsive on January 18, 2016 – another 13 consecutive days. [*Id.*]. It appears that Alton's cell was opened on January 5, 2016 so that photographs could be taken of the inmates. During this process, only 13 days before Alton was found unresponsive

in his cell, Defendants J. Perez and Manuel Ramirez opened Alton's cell.  Defendant Ramirez claims to have removed Alton from his cell, and claims he appeared to be healthy, without any complaints of illness or danger.  As January 5, 2016 is one of several days the State of Texas alleges Alton was severely beaten by his cellmate, these Defendants either entirely ignored Alton's condition at the time they opened his cell door, or they actually observed his condition and simply ignored the obvious need for medical care.

**56.**

Proper cell checks and inmate counts are necessary to ensure the wellbeing of the inmates, and, if not already obvious to all Defendant correctional officers, would have revealed Alton's rapid decline in health, and, ultimately, the lethal injuries he sustained after multiple beatings at the hands of his cellmate.  Given Alton's documented and frequent requests for sick calls, his known mental health illness and other recent health complaints, including but not limited to his loss of vision and a loss of strength so serious that he at one point requested a cane, tennis shoes, and a lower bunk assignment, the Defendant correctional officers were acutely aware of the need to closely monitor Alton to ensure that he was well.  In light of Alton's documented mental health illness, decline in strength and his vision issues, the Defendant correctional officers were also acutely aware of Alton's vulnerability to physical assault at the hands of other inmates.

**57.**

The State of Texas has accused Alton's cellmate, Joe Greggs, of beating Alton's head against concrete floors, walls, or other objects, resulting in serious bodily injury to Alton on five separate occasions in January 2016:  January 5, 2015, January 8, 2016, January 9, 2016, January 14, 2016, and January 17, 2016.  Yet, upon information and belief, no action was taken by any of the named Defendant correctional officers after any of these five alleged assaults to provide Alton with medical care.  Given Alton's serious health issues at this point immediately prior to his death,

when he was dying from Tuberculosis and/or other untreated infections or diseases, and was allegedly beaten by his cellmate, the above-named Defendant correctional officers either actually observed Alton in a near-death state and simply moved on without taking any action to provide him with medical care, or they systematically ignored Alton and his cell entirely over a considerable period of time.

58.

Additionally, the State of Texas and TDCJ should have accommodated Alton's serious, known mental health illness, including his history of hallucinations and paranoia, by providing him with a special housing assignment allowing for closer monitoring of his mental health condition, or, at the very least, TDCJ and its guards should have very closely monitored Alton's behavior and interactions with his cellmate while housed within the general population, especially given very recent altercations between Alton and other inmates, including a November 6, 2016 altercation between Alton and a previous cellmate.

59.

On or around the above dates when the assaults allegedly occurred, Defendant correctional officers claim to have searched Alton's cell. On January 6, 2016, for example, the day following one of the alleged beatings, Defendant Jason Dorsey supposedly retrieved trash and a sheet from within Alton's cell. On January 14, 2016, the same day as of one of the alleged beatings, Defendant FNU Fernando supposedly retrieved trash and extra clothes from Alton's cell. These Defendant correctional officers either actually observed Alton in a near-death state and simply moved on without taking any action to provide him with medical care, or they ignored Alton and his cell entirely.

60.

This deliberate indifference to Alton's security, welfare and medical needs and the

intentional discrimination based on Alton's mental and physical disabilities continued as he entered his final stages of death. Many of Defendant correctional officers who intentionally chose not to conduct mandatory cell checks on Alton were terminated and/or suspended for their conduct. Others were not disciplined, however, even though they claim to have conducted counts and security checks of the inmates in Alton's pod in the hours before he was found unresponsive. Defendants Mario Randal, Krista Barber, Michael Galbreath, Kayla Chapman, Raul Bernal, Dustin Anderson and Zachary Raphael all worked in Alton's pod on either January 17th or January 18th, the date Alton was found unresponsive within his cell, or both. All claim to have performed their daily duties, including inmate counts, bedbook checks, security checks, and meal deliveries, without incident. Yet by this time, Alton was completely immobile and nearing death. These Defendants either entirely ignored Alton's condition at the time, or they actually observed his condition and simply ignored the obvious need for medical care. Defendant Raul Bernal even claims to have conducted security and bedbook checks the morning of January 18, 2016, before Alton was found unresponsive, and that he heard every single offender, including Rodgers, respond and provide their inmate number. Defendant Bernal either entirely ignored Alton's condition at the time, or he actually observed his condition and simply ignored the obvious need for medical care.

**61.**

These failures to follow policy and procedure were done with actual knowledge of Alton's medical and security needs, and his mental and physical disabilities, and were a direct and proximate cause of his death. Their decisions were made with the knowledge of the high risk of harm to Alton and each Defendant knew with certainty that their deliberate indifference to Alton's security and medical needs would lead to injury and probable death. Each Defendant actually made this inference and were aware that harm would probably result as they criminally falsified cell

check records in a conscious effort to hide their conduct. Falsification of government records is a felony crime in Texas, yet none of the Defendants were charged.

### 62.

The below named TDCJ Defendants sued in their individual capacities received the following disciplinary action related to their complete indifference to Alton's medical needs:

Dustin Anderson, who was a Sergeant at the time, was disciplined for signing off on cell searches, indicating that they were actually completed, and completed correctly, when cell doors were never opened for the times documented. He was suspended without pay for three days and placed on disciplinary probation for 11 months. Anderson was previously disciplined in 2014 for an excessive force incident.

### 63.

Rowdy Boggs, who was a Lieutenant at the time, was terminated "[d]ue to the serious nature of the conduct and lack of oversight to ensure agency policy was followed." He was terminated for failing to ensure that daily searches were both conducted and documented, and for failing to ensure that at least one cell search was done per month. Defendant Boggs was previously disciplined in 2011 for his failure to promptly ensure that an inmate, who purportedly committed suicide, was timely transported for emergency care, noting that there "was an obvious lack of urgency" in Boggs' response.

### 64.

Jamie Burkholder, who was a Sergeant at the time, was disciplined for signing off on a search of Mr. Rodgers' cell that was never completed. He was suspended without pay for three days and placed on disciplinary probation for 11 months. Defendant Burkholder was previously disciplined in 2008 and 2015 for excessive force incidents.

### 65.

Kayla Chapman, who was a Correctional Officer at the time, was disciplined for failing to conduct the inmate count on January 18, 2016, the date that Mr. Rodgers was found unresponsive in his cell.  She was placed on disciplinary probation for six months.

### 66.

Jonathan Crow, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened.  He was suspended without pay for 1 day and was placed on disciplinary probation for nine months. Defendant Crow was previously disciplined in 2013 for "trafficking and trading unknown items inside a white commissary bag" within the prison.  It appears that he received only 6 months of probation for this incident.

### 67.

Jason Dorsey, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened.  He was suspended without pay for 2 days and placed on disciplinary probation for ten months. Defendant Dorsey was also disciplined earlier the same month Alton died for improper use of chemical agents on an inmate.

### 68.

Jerry Gillis, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened.  He was suspended without pay for 1 day and was placed on disciplinary probation for 9 months. Defendant Gillis was previously disciplined for unexcused absences from work in 2011.

**69.**

Patrick Hagemeier, who was a Correctioal Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened.  He was suspended without pay for 1 day and was placed on disciplinary probation for 9 months.

**70.**

Michael Jackson, who was a Sergeant at the time, was disciplined for failing to complete unannounced documented inspections.  He was suspended without pay for 1 day and placed on disciplinary probation for 7 months.

**71.**

Jakob Kelso, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened.  He was placed on disciplinary probation for 9 months and was suspended without pay for 1 day.

**72.**

Wilbur Kemph, who was a Captain at the time, was disciplined for failing to complete unannounced inspections.  He was suspended without pay for 1 day and placed on disciplinary probation for 7 months.  Defendant Kemph has been disciplined various times in the past, including for excessive force incidents.

**73.**

Christopher Kyle, who was a Lieutenant at the time, was disciplined for failing to complete unannounced inspections.  He was suspended without pay for 1 day and placed on disciplinary probation for 7 months.  Defendant Kyle has been disciplined various times in the past, including for failing to report an inmate's medical condition to the medical staff in a timely manner in 2007.

**74.**

Isaiah Lopez, who was a Correctional Officer at the time, was disciplined for failing to complete his assigned cell searches, including the search of Alton's' cell, and falsifying records to indicate that Alton's cell had been searched when the cell door had never been opened. He was suspended without pay for 1 day and placed in disciplinary probation for nine months.

**75.**

Julio Lucero, who was a Sergeant at the time, was disciplined for signing off on cell searches that had never been completed. He was suspended without pay for 1 day and placed on disciplinary probation for 7 months.

**76.**

Jason Moeller, who was a Sergeant at the time, was disciplined for signing off on cell searches that had never been completed. He was suspended without pay for 3 days and placed on disciplinary probation for 11 months. Defendant Moeller has been disciplined several times in the past, including for the failure to complete an accurate recount on inmates.

**77.**

Kevin Mullins, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened. He was suspended without pay for 1 day and placed in disciplinary probation for nine months.

**78.**

Marshall Pace, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened. He was suspended without pay for 1 day and placed in disciplinary probation for 6 months.

**79.**

Timothy Phillips, who was a Captain at the time, was disciplined for failing to complete unannounced inspections. He was suspended without pay for 1 day and placed on disciplinary probation for 7 months. Defendant Phillips was disciplined previously for failing to report sexual abuse allegations by a female officer as her Sergeant.

**80.**

Preston Russell, who was a Correctional Officer at the time, was disciplined for failing to complete assigned cell searches, and for falsifying records to indicate that he had done the searches, including searches of Alton's cell, when Alton's cell door was never even opened. He was suspended without pay for 1 day and placed in disciplinary probation for 9 months.

**81.**

Also during this critical period, when Alton reached a state of advanced starvation, had been bedridden for an extended period of time, and was dying, TTUHSC employees, including Defendants Maria Carrizales, Tammy Williams, Karen Raper, aka Karen Barber, Hellen Kitchen, Roger Kiehl, Peggy Kreig, Leticia Diaz, and Tramesha Rivers, certified that they daily administered medications to Alton, and that he was "accepting" the drugs. Upon information and belief, these Defendants were required to verify Alton's identity and physically observe Alton walk up to the cell door and accept the medications in order to represent that he "accepted" the drugs.

**82.**

Medical records indicate that the above TTUHSC Defendants were allegedly administering medications to Alton every day of the final month of his life, including up until less than a day before he was found completely unresponsive in his cell. Some of these Defendants, namely Defendants Kitchen and Raper, purport to have administered medications to Alton on consecutive days during the final two weeks of his life, including the days that the State of Texas alleges

Alton's cellmate, Joe Greggs, beat Alton's head against concrete floors, walls, or other objects, resulting in serious bodily injury to Alton. In addition, Defendants Carrizales and Williams, both licensed nurses, had been involved with Alton's actual medical care throughout the previous year, and were aware of his health issues. Yet neither of these Defendant nurses took any action to treat Alton after purportedly observing him and administering medications to him in the final weeks of his life. Given Alton's serious health issues at this point immediately prior to his death, and his inability to ambulate for at least some, if not all, of that final month, the above TTUHSC Defendants either never took the time to verify his identity prior to dropping his medications, or they observed Alton in a near-death state and simply moved on without taking any action to treat him.

## BACKGROUND FACTS RELATED TO THE KNOWING DESTRUCTION OF EVIDENCE

### 83.

Early the morning of January 18, 2016, after Alton was found in a near death state and was removed from his cell, the facility "Support Services Inmates" ("SSI") reported for their morning assignments within the Expansion Cell Block of the Clements Unit, or the "ECB", where Alton was housed. These inmates were assigned various duties, including janitorial work, within the various pods.

### 84.

One SSI entered the ECB and noticed right away that something had happened. Warden Barry Martin, an assistant Warden, and members of the on-site investigative office were on site. The SSI heard Warden Martin and the others saying that "Huntsville" was on the way, and would arrive by 8:00 a.m. The SSI observed investigators conducting recorded interviews within the ECB.

**85.**

All of the officers within the ECB at that time appeared to be nervous, and Warden Martin was stomping around and cursing. The SSI overheard Warden Martin give one of his Lieutenants, Lieutenant Thompson, the direct order to get someone into the cell in order to clean it. The Lieutenant then ordered the SSI into Alton's cell, C210.

**86.**

The SSI was ordered to clean the cell; specifically to get some water and bleach, and to scrub the cell. At that time, the SSSI did not know what had happened, or that they had just found Alton Rodgers unresponsive in the cell.

**87.**

When the SSI headed toward the cell, Warden Martin and his Assistant Warden were still within the ECB. They saw the SSI walk towards the cell to clean it with a mop bucket and brush.

**88.**

When the SSI arrived at Alton's cell, the cell door had been opened. There was trash everywhere, food on the floor, and the stainless steel what behind the cell's toilet and sink appeared to be covered in urine. The toilet was filthy and full of waste.

**89.**

It appeared that there had been standing water within the cell, and that the cell's drain had just been fixed. There was a large slimy stain on the floor around the cell's drain. The cell only had one mattress, on the top bunk. The SSI noticed a line of dust and debris around where a mattress would have been on the lower bunk. It was the SSI's experience that a cell would have two mattresses, one for each inmate. The SSI noticed a dried fluid on the frame of the bottom bunk. There were no sheets on either bunk.

**90.**

As he was directed to do, the SSI scrubbed the cell. He used a towel to remove the fluid from the frame of the bunk bed. He picked up all of the trash and debris, wiped down the table, wiped the shelf, and cleaned the sole mattress within the cell. The SSSI also scrubbed the toilet, cleaned the urine covered wall and mopped the cell. The officers on site were rushing the Inmate to finish cleaning quickly.

### 91.

It appeared to the SSI that others had already been in the cell, as the door was secured open before he had entered. The Inmate had noticed that Mr. Rodgers' cell had been dark before, when other cells had been lit. This indicated to the SSI that maintenance had been into the cell to repair the light.

### 92.

As the Inmate finished cleaning the cell and removing the cleaning supplies, he heard that the investigators from Huntsville had arrived.

### CLAIMS FOR RELIEF

## I.    CLAIMS ARISING UNDER 42 U.S.C. § 1983

**Cruel and Unusual Punishment through Deliberate Indifference to Serious Medical Needs and Security in Violation of the Eight Amendment to the U.S. Constitution against TTUHSC Defendants Carrizales, Williams, Raper, Kitchen, Kiehl, Kreig, Diaz, and Rivers; TDCJ Defendants Boggs, Hagemeier, Crow, Burkholder, Gillis, Pace, Moeller, Anderson, Kemph, Dorsey, Kyle, Lucero, Chapman, Jackson, Lopez, Kelso, Mullins, Phillips, Russell, Bernal, Barber, Randal, Ramirez, Perez, Raphael, Galbreath and Franco, in their individual capacities.**

### 93.

Plaintiff incorporates all previous paragraphs as though fully recited herein.

### 94.

The above-named Defendants acted with deliberate indifference to Alton's health and safety when they placed Alton, a known mental health patient, in a cell with another inmate and

proceeded to either ignore him for the better part of two months, or to actually observe Alton sustain violent, multiple beatings and waste away without ever providing him with any medical or other assistance of any kind.  During this time, Defendants failed to ensure that Alton was eating or taking his medications, and Defendants failed to open the cell door to clean, conduct cell inspections or searches, or to otherwise conduct inmate counts or ensure that Alton was responsive or even alive.

### 95.

The wrongful acts and omissions of the Defendants constitute reckless disregard and conscious indifference to Alton's safety and medical wellbeing and posed a substantial risk of serious harm in violation of his right to due process of law and to be free of cruel and unusual punishment.  They also constitute cruel and unusual punishment.

### 96.

Because Alton's death was highly predictable and was a plainly obvious consequence of Defendants' disregard of Alton's serious medical and security needs, Defendants acted with deliberate indifference even absent a pattern of similar unconstitutional behavior.

### 97.

The Defendants were aware of Alton's medical history and declining mental and physical health, and were also acutely aware of Alton's vulnerability to physical assault at the hands of other inmates.  The Defendants acted with deliberate indifference by failing to monitor Alton and secure him medical care when it was obviously needed, and by failing to keep him safe from violence at the hands of other inmates.  Their actions constituted cruel and unusual punishment of Alton.

### 98.

The wrongful acts and/or omissions of Defendants constitute reckless disregard and

conscious indifference to Alton's safety and medical well-being and posed a substantial risk of harm in violation of his right to due process of law and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution. Furthermore, the above-described wrongful acts constitute evidence that Defendants acted willfully, deliberately, maliciously, or with reckless disregard to Alton's safety and medical wellbeing, in violation of 42 U.S.C. § 1983, and were a proximate cause of Alton's death and resulting injuries.

**99.**

Moreover, Defendant Rowdy Boggs, while also sued in his official capacity, was personally involved in the denial of medical care and security to Alton Rodgers. Defendant Boggs was individually disciplined following Alton Rodgers' death for the "serious nature of the conduct and lack of oversight to ensure agency policy was followed" after he failed to ensure the searches of his subordinates were conducted and documented.

**Supervisory Liability Claims against Defendants Martin and Boggs, in their official capacities.**

**100.**

Officials at TDCJ, including former Senior Warden Barry Martin, and Lieutenant Rowdy Boggs, officials with supervisory and policymaking authority, were aware of and failed to address a pattern and practice of denying needed medical and security (cell checks) care to inmates. They were aware of this from inmate grievances, reports prepared by TDCJ officers, and two current wrongful death lawsuits pending in the Northern District of Texas alleging denied medical care and security lapses. This custom and unconstitutional practice of denied medical care and security needs amounted to cruel and unusual punishment and has been perpetuated for years by TDCJ policymakers and implemented by prison staff without redress. This custom and unconstitutional practice resulted in the deprivation of Alton Rodgers' constitutional rights.

**101.**

Moreover, Defendants failed to implement appropriate policies that could have prevented Alton's death and had a pattern of disregarding the serious medical and security needs of its wards. Their collective inaction in implementing these policies were the result of deliberate indifference to the rights of those wards, including Alton.

**102.**

Defendants (administrators, policymakers and supervisors) had actual and constructive notice that their employees and agents were not meeting the serious medical and security needs of Alton, but these Defendants failed to train or supervise its employees and agents with respect to treating the serious medical and security needs of inmates like Alton who were suffering from treatable conditions and/or were in danger.

**103.**

Defendants' pattern of unconstitutional conduct and policies were so pervasive as to constitute actual or constructive knowledge of the conduct on the part of its policymakers, whose deliberate indifference to the unconstitutional practices is evidenced by a failure to correct the situation once the need for training and supervision became obvious. The above described acts and omissions constitute a pattern of constitutional violations and were a proximate cause of Alton's death. This pattern of unconstitutional policies, procedures and neglect, included but were not limited tothe failure to effectively monitor inmates through counts and cell checks, during the dispersal of medication, or by simple observation.

**104.**

Defendants' lack of supervision, training, and policymaking were a moving force behind the constitutional violations alleged herein and Alton suffered damages, injuries and death as a result. Furthermore, the ultimate decision not to prosecute any of the named Defendants in

connection with the failure to monitor Alton's cell, and the falsification of records relating to the same, should that be the case, amounts to ratification of the Defendants' conduct in this matter.

### 105.

The above-described deprivations of Alton's constitutional rights to needed medical care and safety were a direct and proximate result of the acts, omissions, policies, and customs of Defendants. As a direct and proximate result of the constitutional violations alleged herein, Alton suffered great physical and mental pain, anguish, shock, agony, and ultimately death. Defendants acted with an evil motive or intent or with reckless or callous indifference to Alton's constitutionally protected rights. Individual capacity Defendants are therefore liable for punitive damages

### 106.

Notice of Tort Claims, if necessary, was served on behalf of the Plaintiff within the time required to preserve claims arising under the Texas Tort Claims Act. The notice was served via the United States Postal Service on April 15, 2016 to: Texas Department of Criminal Justice; Williams P. Clements Unit; Texas Department of Criminal Justice, Office of General Counsel; Texas Department of Criminal Justice, Brad Livingston; Texas Department of Criminal Justice, Texas Board of Criminal Justice; and Warden Kevin Foley, William P. Clements Unit. TDCJ is and was at all relevant times, a partner and/or joint venture member and/or co-agent with Texas Tech Health Sciences Center. Therefore, statutory notice served on TDCJ is effective service on Texas TTUHSC by virtue of their partnership, membership and/or agency agreement.

### 107.

The Plaintiff incorporate by reference all preceding paragraphs.

### 108.

Alton needed medical care and security and he did not receive any care or real monitoring,

and this was the result of Defendants deliberate indifference to his needs. He died because he was refused proper and needed medical care and security.

**109.**

As a result of cruel and unusual punishment inflicted by the Defendants through denial of needed medical and security care, Alton suffered from severe pain and suffering, mental anguish, physical impairment, fear of permanent injury or death, death by starvation and injuries sustained after multiple beatings at the hands of his cellmate, and organ failure. Damages to Alton and his estate are stated in more detail below.

**Violation of the Right of Access to the Courts against Defendant Martin in his individual capacity, the State of Texas, and the Texas Department of Criminal Justice**

**110.**

The right of access to the courts is well established as a fundamental right protected by the United States Constitution. The violation of this right is actionable under 42 U.S.C. § 1983.

**111.**

Warden Martin, and the State of Texas and the Texas Department of Criminal Justice, acting through Warden Martin and other officials, have intentionally and in bad faith destroyed and concealed evidence resulting in prejudice to Plaintiff's claims for relief under 42 U.S.C. § 1983 for Defendants' deliberate indifference to Alton Rodgers' serious medical and security needs, and her claims for relief under the Americans with Disabilities and Rehabilitation Acts.

**112.**

By apparently removing various items from the cell, including a mattress and other bedding; fixing the lighting with the cell; and repairing a clog in the cell's drain, Defendants intentionally and in bad faith destroyed and concealed evidence resulting in a burden or prejudice to Plaintiff's claims.

**113.**

Further, through directing a Support Services Inmate to scrub Alton Rodgers' cell from top to bottom before investigators from the Office of Inspector General arrived on scene to conduct their investigation, Defendants intentionally and in bad faith destroyed and concealed evidence resulting in a burden or prejudice to Plaintiff's claims.

**114.**

Despite knowing that all of the evidence within the cell would be pertinent to any and all internal investigations, the criminal case against Alton Rodgers' cellmate, and any potential litigation flowing from Alton Rodgers' in-custody death, Defendants intentionally destroyed the above evidence from within Alton Rodgers' cell.

**115.**

The destruction of this evidence impacts Plaintiff's ability to prove certain aspects of her case, and may ultimately result in the inability to prove certain aspects of her case.

**116.**

Plaintiff has suffered damages as a result of Defendants' destruction of evidence.

**117.**

Defendant Martin destroyed evidence with malice and with reckless indifference, justifying an award of punitive damages.

**118.**

For claims arising under 42 U.S.C. § 1983, the Estate is entitled to recover reasonable attorney fees and costs of litigation pursuant to 42 U.S.C. § 1988.

**II.    CLAIM ARISING UNDER AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT AGAINST STATE OF TEXAS, TTUHSC, AND TDCJ**

**119.**

Plaintiff incorporates all previous paragraphs as though fully recited herein.

**120.**

The State of Texas, TTUHSC, and TDCJ were at all times material to the allegations herein recipients of federal funds and are therefore are covered by the mandates of the Rehabilitation Act. The Rehabilitation Act requires the recipients of federal monies to make reasonable accommodations for persons with mental and physical disabilities in their facilities, program activities, and services, and reasonably modify such facilities, services, and programs to accomplish this purpose.

**121.**

Further, Title II of the Americans with Disabilities Act (ADA) applies to the State of Texas, TTUHSC, and TDCJ, and has the same mandate as the Rehabilitation Act, and affords the same rights and remedies to plaintiff.

**122.**

The Clements Unit is a state facility and the operation of the Clements Unit comprises a service, program, or activity for purposes of both the Rehabilitation Act and the ADA.

**123.**

For purposes of both the ADA and Rehabilitation Act, Alton Rodgers was a qualified individual with a disability, namely a mental impairment, which substantially limited one or more of his major life activities. Defendants knew that Alton Rodgers suffered from a well-documented, long-term mental illness that required psychiatric medications; that he had a history of severe psychotic episodes that included hallucinations; and that he suffered from such psychotic episodes during his incarceration.

**124.**

After Alton was assigned a new cellmate in the Fall of 2015, and after he had been stripped of his antipsychotic mediations while experiencing hallucinations, he also suffered from physical

impairments limiting one or more of his major life activities after he was severely beaten by his cellmate on multiple occasions in January of 2016.  When Alton was found in January of 2016, he was emaciated, had been bedridden for an extended period of time, and had been suffering from multiple injuries including bone fractures, and a large acute subdural hematoma.

### 125.

In spite of this long-term and well-documented mental health impairment, of which Defendants were aware, the State of Texas and TTUHSC intentionally discriminated against Alton Rodgers.  The State of Texas and TTUHSC employees intentionally discriminated against Alton Rodgers when they failed to provide him with the physical and mental healthcare and medications he required; failed to refer him for appropriate mental health treatment; failed to monitor his progress after a dramatic change in medication; and failed to ensure that TDCJ provided Alton with a housing assignment appropriate for someone suffering from psychotic episodes marked by hallucinations, aggression, and paranoia.

### 126.

The State of Texas and TDCJ employees intentionally discriminated against Alton Rodgers when they placed Alton, a known mental health patient with a history of psychotic episodes marked by hallucinations, aggression, and paranoia in a cell with another cellmate, days after an altercation with a previous cellmate, and then failed to open or in any way monitor the cell for almost two months.  During this time, Alton Rodgers predictably sustained physical impairments and ultimately lethal injuries that left him bedridden and unable to eat or otherwise participate in any activities whatsoever, which went untreated for an extended period of time and lasted until his death.

### 127.

Defendants thus failed and refused to reasonably accommodate Alton Rodgers' mental and

physical disabilities while in custody, in violation of the ADA and Rehabilitation Act. That failure and refusal caused his death.

### 128.

Defendants violated the ADA and the Rehabilitation Act as they failed and refused to reasonably modify its facilities, services, accommodations, and programs to accommodate Alton Rodgers' mental and physical disabilities, including the failure to provide Alton with the medical and mental health treatments, medications, and monitoring necessary to accommodate Alton Rodgers' mental and physical disabilities. These failures and refusals, which were intentional, proximately caused his death.

### 129.

Alton Rodgers died as a direct result of Defendants' intentional discrimination against him. Accordingly, Plaintiff is entitled to the maximum amount of compensatory damages allowed by law.

### DAMAGES

### 130.

The Plaintiff incorporates by reference all preceding paragraphs.

### 131.

Defendants' acts and/or omissions were a proximate cause of the following injuries and damages suffered by the Estate of Alton Rodgers:

   a)   Actual damages;
   b)   Pain and suffering and mental anguish suffered by Alton prior to his death;
   c)   Funeral and burial expenses;
   d)   Exemplary damages;
   e)   Pre-judgment interest;
   f)   Post-judgment interest;
   g)   Attorney's fees, costs, and litigation expenses under 42 U.S.C. § 1988 and
         42 U.S.C. § 12205 or as allowed by law.

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be cited to appear and answer herein; that upon final trial hereof, Plaintiff have judgment against the Defendants, jointly and severally, for the full amount of their damages, as herein alleged; pre-judgment interest and post-judgment interest at the legal rate; costs of Court; Attorney fees and such other and further relief to which they may show themselves to be justly entitled.

DATED, this _____ day of June, 2017.

Respectfully submitted,

ROTHSTEIN DONATELLI LLP

*s/ Maggie H. Lane*
**Carolyn M. "Cammie" Nichols**
*NM Bar No. 7624*
**Maggie H. Lane**
*NM Bar No. 142946*
(505) 243-1443 – Telephone
(505) 242-7845 – Facsimile
cmnichols@rothsteinlaw.com
mhlane@rothsteinlaw.com

and

QUACKENBUSH LAW FIRM

*s/ Jesse L. Quackenbush*
**Jesse L. Quackenbush**
**State Bar No. 16421975**
**801 S. Fillmore, Suite 460**
**Amarillo, Texas 79101**
**(806) 374-4024 – Telephone**
**(806) 352-0073 – Facsimile**
**Email: jesseqlf@gmail.com**
ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of June, 2017, I filed the foregoing electronically through the CM/ECF system in the Northern District of Texas, Amarillo Division,

which caused counsel for Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

_s/ Maggie H. Lane_____
ROTHSTEIN DONATELLI LLP
