IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| GWENDOLYN DOLORES RODGERS PATRICK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ALTON RODGERS, DECEASED, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | 2:16-CV-216-D-BR |
| BARRY MARTIN, et al., | § § | |
| Defendants. | § § | |

**MEMORANDUM OPINION
AND ORDER**

Plaintiff Gwendolyn Dolores Rodgers Patrick ("Patrick") brings this lawsuit under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq*.; and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, against Defendants Texas Department of Criminal Justice ("TDCJ"), Texas Tech University Health Sciences Center ("TTUHSC"), the State of Texas, Barry Martin ("Warden Martin"), Dustin Anderson ("Sgt. Anderson"), Jamie Burkholder ("Sgt. Burkholder"), Julio Lucero ("Sgt. Lucero"), Michael Jackson ("Sgt. Jackson"), Trevin Mogilnicki ("Sgt. Mogilnicki"), Curtis Taylor ("Officer Taylor"), Mario Randal ("Officer Randal"), and Certified Medication Aide Karen Raper ("CMA Raper") based on the in-custody death of her son Alton Rodgers ("Rodgers") after he sustained injuries from multiple assaults by his TDCJ cellmate, Joe Greggs ("Greggs").[1]

---

[1] Numerous individual defendants have been voluntarily dismissed or otherwise terminated from this lawsuit. Consequently, the only claims remaining are those against the parties identified in this introduction. Where terminated or dismissed individuals are agents of entities that remain a party to this suit, the Court considers their actions in determining if the entity maintains liability under the ADA or the RA.

Patrick claims that Officer Taylor, Officer Randal, CMA Raper, Sgt. Anderson, Sgt. Lucero, Sgt. Jackson, Sgt. Mogilnicki, Sgt. Burkholder, and Warden Martin — in his official capacity only — were deliberately indifferent to Rodgers's safety and health in violation of the Eight Amendment; that both Warden Martin and TDCJ violated Rodgers's right of access-to-the-courts through the destruction of critical evidence to her claims[2]; and that TDCJ, TTUHSC, and the State of Texas violated Rodgers's rights under the ADA and the RA. Defendants have filed eight motions seeking summary judgment on all claims against them.[3]

For the reasons that follow, the Court grants summary judgment to all defendants on all claims — except for Patrick's claims of "deliberate indifference to safety" pending against Officer Taylor, Officer Randal, Sgt. Burkholder, and Sgt. Mogilnicki. As discussed below, Patrick has provided sufficient summary judgment evidence that a genuine issue of material fact exists regarding whether these four defendants had actual knowledge of the practice of "pencil-whipping" at the Clements Unit — particularly on the cell block where Rodgers was housed with Greggs. Consequently, Patrick *has* raised a genuine issue of material fact that these defendants were aware of a substantial risk of harm to Rodgers's safety and consciously disregarded that risk by failing to correct the "pencil-whipping" practice. Thus, as outlined in this Memorandum Opinion, these defendants are not entitled to qualified immunity on these claims.

---

[2] Patrick concedes that her access-to-the-courts claim against TDCJ pursuant to Section 1983 is not viable given Eleventh Amendment immunity protections. *See* (ECF No. 381). As the Court will explain later in this Memorandum Opinion, this claim therefore should be denied with prejudice. The Court notes that Patrick's access-to-the-courts claim against the State of Texas was previously dismissed with prejudice after Patrick conceded the claim was not viable. (ECF No. 232). However, Patrick continues to pursue her access-to-the-courts claim against Warden Martin, requesting declaratory relief. That claim is discussed in Section IV(A)(2).

[3] Defendants also objected to Patrick's summary judgment evidence — specifically, the form of the evidence. (ECF No. 396 (Officer Randal) at 1–2, ECF No. 397 (TDCJ) at 3–4, ECF No. 398 (State of Texas) at 1–2, ECF No. 399 (Barry Martin) at 4–5, ECF No. 405 (TDCJ sergents) at 1–2, ECF No. 403-2 (CMA Raper) at 4–5, and ECF No. 407-1 (TTUHSC) at 5–6). Officer Taylor did not file a reply to Patrick's MSJ Responses and, therefore, did not make these same objections. Because Patrick did not comply with relevant Local Rules, the Court ordered Patrick to revise her briefing and evidence citations therein to comply with these rules. (ECF No. 415). Patrick filed corrections as required. Thus, the Court finds the defendants were not prejudiced and that the evidence should not be excluded.

FACTS

This lawsuit arises out of the death of Rodgers while he was incarcerated at the Clements Unit of TDCJ. According to Patrick's fifth amended complaint, Rodgers was housed at the Clements Unit from 2011 to the time of his death on January 18, 2016. The Court lays out the relevant material facts as follows:

Rodgers was received by TDCJ for his current sentence on June 9, 2006, at the age of 21. (TDCJ DEFS MSJ APPENDIX (hereinafter "TDCJ-APP")[4] 1459, 1462). About four months prior to that date, Rodgers's height and weight was recorded as 6'3" and 145 pounds. *Id*. at 1459. Rodgers was serving a life sentence for capital murder. *Id*. Rodgers began his incarceration at the Polunsky Unit and then spent time at the Michael Unit. (TDCJ-APP 1462). He was eventually transferred to the Clements Unit of TDCJ located in Amarillo, Texas, in 2014. *Id.* Rodgers also served a prior sentence with TDCJ and appears to have been incarcerated most of his adult life. (PLAINTIFF'S APPENDIX (hereinafter "P-APP") 47).

## I. Rodgers's Mental and Physical Health Through November 2015

On October 6, 2011, Rodgers was sent to "Skyview," a TDCJ mental-health facility at the Michael Unit. (P-APP 46, 50). At the time, Rodgers exhibited signs of disorganization and confused wording. *Id*. at 46. He was diagnosed with psychotic disorder NOS, or "not otherwise specified." *Id*. It was noted during an evaluation on October 10, 2011, that Rodgers was "very thin for his height," and "undernourished," although his weight was not taken. (P-APP 51–52).

---

[4] Citations to the record throughout this Memorandum Opinion are to documents filed under seal. Specifically, this Court cites the appendices attached to the motions for summary judgment, to the responses, and to the replies. However, the evidence cited within this Memorandum Opinion, after redaction for sensitive information or information protected from release under the law, is also publicly available and contained, as redacted, in the record at (ECF Nos. 444–46). Therefore, this Memorandum Opinion is not filed under seal.

He remained at Skyview for acute patient treatment until January 26, 2012. (P-APP 46, 50). Upon his release, his official diagnosis changed to schizophreniform disorder. *Id.*

Rodgers was diagnosed with varying forms of psychosis and mental health illness at Skyview in 2011 and 2012. *See* (P-APP 45–54, 59–92).  During his time at Skyview, Rodgers presented with and self-reported symptoms consistent with those diagnoses such as auditory hallucinations, *see* (P-APP 47, 51, 61, 86), rambling speech, *see* (P-APP 47, 62, 68, 75, 86, 90), and paranoia, *see* (P-APP 52–53, 86, 92).

Upon his return to the Michael Unit on January 26, 2012, Rodgers was placed in outpatient services and the Treatment and Prevention Relapse Program. (P-APP 46). He was reviewed every 90 days for medication compliance and was admitted again to Skyview on March 30. *Id.* During his second admission, his diagnosis was changed to bipolar 1 disorder with psychotic features. *Id.* Additionally, Rodgers was reported as being "manic, not taking medicine, hygiene issues." *Id.* He was also described as "not eating" and unable to function at this unit of medical assignment. (P-APP 68). During an examination on April 2, Rodgers was classified with an "inability to care for [his] own basic needs." (P-APP 82).

On April 5, a hearing was held at Skyview to determine if Rodgers could be provided antipsychotic medication without his consent. (P-APP 90). This hearing arose due to medication compliance issues and deterioration. *Id.* It was determined that medication could be compelled as needed because Rodgers's failure to comply with his medications was "likely to cause serious harm to [him] and/or others." *Id.* It was also determined that this failure was "likely to result in continued suffering from severe and abnormal mental, emotional, and physical distress or deterioration of [his] ability to function independently." *Id.* After several different periods of treatment in mid-2012, Rodgers was discharged from Skyview.

Rodgers was once again sent to Skyview from the Michael Unit on June 12, 2014. (P-APP 93). This occurred after he reported hearing voices for approximately three years, consistent with his initial inpatient treatment. This appears to be his last treatment at Skyview. At this time, his diagnosis was antisocial personality disorder and schizophrenia, with an indication of numerous other mental health issues and diagnoses in the past. *Id.*

However, Rodgers intermittently continued to present with and self-report the same or similar symptoms until late-2015. *See, e.g.*, (P-APP 93) (providing evidence that Rodgers experienced auditory hallucinations — in this case, hearing voices — in 2014 and evidence that he began hearing those hallucinations three years earlier); (P-APP 128, 130, 144, 157) (providing evidence that Rodgers experienced the same kind of auditory hallucinations in 2015); (P-APP 108–112, 117) (providing evidence that Rodgers experienced visual hallucinations — in this case, alleged blindness — in 2015); (P-APP 109, 216) (providing evidence that Rodgers experienced paranoia — in this case, complaints of food being poisoned and bleach being thrown in the eyes — in 2015). Dr. Homer Venters, Patrick's medical expert, concluded that the Skyview diagnoses were "generally reflect[ive of] lifelong mental health diagnoses" and that "the following three and a half years [were] remarkably consistent with the established trajectory of lifelong serious mental illnesses." (P-APP 21) (quoting Dr. Venters referring to the three and a half years during which Rodgers continued to be housed at the Michael Unit and was intermittently being treated at Skyview during that time). Dr. Venters's opinions and other evidence shows that at various points in time Rodgers's mental health illnesses were treated as "chronic" conditions. *See, e.g.*, (P-APP 93) (indicating in 2014 that Rodgers was on an "Individualized Treatment Plan for Psychiatry Chronic Care"); (P-APP 61) (indicating in 2012 that Rodgers had been previously assigned to a

"Chronic Treatment Track"); *see also* (P-APP 172) (suggesting that Rodgers's mental health illnesses were "chronic").

After his transfer to the Clements Unit on October 28, 2014, Rodgers continued to display signs of mental health issues. (TDCJ-APP 1462, P-APP 108). Based on complaints of vision problems and displays of paranoia, the medical staff at the Clements Unit evaluated Rodgers on July 23, 2015. (P-APP 111). Rodgers complained that someone had "thrown bleach" in his eye and that he was losing his ability to see. *Id*. Four days later on July 27, Rodgers was referred to a specialist regarding his vision, although it appeared that his vision concerns might have been related to his mental health issues. (P-APP 118). In September 2015, an ophthalmologist evaluated Rodgers and discerned no evidence of blindness, but instead determined that Rodgers was "malingering." *See* (P-APP 24, 126, 194, 197).

On August 5, 2015, TTUHSC psychiatrist Ikechukwu Ofomata conducted a follow-up psychiatric evaluation of Rodgers or "telepsychiatry encounter" via video teleconference. (P-APP 127). The record indicates that prior to their first meeting, Dr. Ofomata "review[ed Rodgers's] disciplinary records and use of force records for the previous two years, along with his medical and mental health records." (P-APP 128). At the time of this encounter, Rodgers was currently prescribed Haldol and Benadryl for side effects for bipolar disorder and was still reporting "hearing voices." *Id*. Rodgers was once again diagnosed with antisocial personality disorder at this evaluation. *Id*. at 127–128.

On September 10, 2015, Rodgers was tested for levels of Haldol in his system, and the results indicated that he was not taking his medications. (P-APP 128). Rodgers had a long history of medication compliance issues. *See, e.g.*, (P-APP 46, 59, 61, 66, 90, 93). On October 13, Dr.

Ofomata discontinued Rodgers's Haldol prescription due to non-compliance in taking the drug as prescribed. *See* (P-APP 128, 139–141).

Also before the Court is Rodgers's TDCJ Health Summary for Classification Form on October 13, the same day that his Haldol prescription was discontinued. This document indicates that he had a "PULHES" classification of "S3NR" and certain medical restrictions. (P-APP 200). According to Patrick's correctional practices expert Frank AuBuchon, the former Administrator for Classification Operations at the TDCJ Classification and Records Headquarters:

> This PULHES classification is an indication that offender Rodgers has a significant mental health issue. Further, the form shows that Rodgers has a restriction that he must be housed on a facility that has extended medical department hours and a restriction that a member of the Mental Health Department must be consulted before taking disciplinary action against the offender.

(P-APP 205). The Court notes that Rodgers's October 13 TDCJ Health Summary for Classification Form expressly provides "no restriction" for Rodgers's basic housing assignment: the "single cell only" and "special housing" options on the form are blank. (P-APP 200).

The record indicates that Rodgers filed two I-60 requests on October 20 and 23, 2015, to be placed back on his antipsychotic medication, but these requests were never granted. *See* (P-APP 142, 144). He was, however, interviewed cell-side on October 23 by TTUHSC Mental Health Clinician Gerald Granat after making these requests. *See* (P-APP 157, 160-63). During the interview, Rodgers denied experiencing any hallucinations. *See* (P-APP 157, 162). Granat concluded that Rodgers exhibited no symptoms of psychosis, mania, depression, or any other mental health problem. (P-APP 161). Dr. Ofomata's own treatment records pertaining to Rodgers indicate that:

- Rodgers was previously diagnosed with varying forms of psychosis and mental health illnesses, *see* (P-APP 131, 133–34);

- Rodgers met with and reported hearing voices to Dr. Ofomata on August 8, *see* (P-APP 130);

- Dr. Ofomata's goals for Rodgers on August 8 and November 20 — before and after taking Rodgers off of his antipsychotic medication — were for him to avoid suicidal, homicidal, assaultive, and self-injurious behavior and to comply with medications to normalize mood and ameliorate psychotic behavior, *see* (P-APP 132, 152); and

- Dr. Ofomata prepared Rodgers's October 13 TDCJ Health Summary for Classification Form, which indicates that Rodgers had a "PULHES" classification of "S3NR" and certain medical restrictions, *see* (P-APP 200).

Dr. Ofomata was scheduled to see Rodgers on November 10, 2015, but Rodgers was disciplined for TDCJ rule violations before this visit occurred. *Id.* Consequently, the visit was rescheduled to November 20. *Id*. On November 20, Dr. Ofomata observed Rodgers exhibiting signs of depression — but not psychosis or mania. *Id*. Dr. Ofomata diagnosed Rodgers with Intermittent Explosive Disorder and indicated that he wanted to keep Rodgers on his caseload to be seen periodically. *Id*. The record shows that no further sick calls were requested by Rodgers and no further examinations were made after November 20.

Patrick's correctional medicine expert Dr. Homer Venters opined that Rodgers should have been placed in a single cell while housed at the Clements Unit because "persons with psychotic disorders particularly, even when they are faring well, can experience high levels of paranoia, agitation that may not be noticeable to clinical staff or that may not be reported to clinical staff." (P-APP 180). Relatedly, Mr. AuBuchon opined that "TDCJ and its employees should have, if nothing else, provided enhanced monitoring of Rodgers given his mental health status." (P-APP 205). However, TTUHSC's own medical expert Dr. Benjamin Leeah concluded based on his review of the summary judgment evidence that Rodgers "did not suffer from any chronic medical conditions." (TTUHSC-APP 13).

## II.  Rodgers and Greggs Become Cellmates

Greggs was housed on the ECB unit in cell C-210 on November 10. (TDCJ-APP 1462). Rodgers was housed on the ECB unit in cell C-210 five days later on November 15. *Id*. Prior to his assignment to cell C-210, Greggs had received 15 major disciplinary convictions during his time at TDCJ. The period during which he received these convictions lasted from his entry into TDCJ on September 13, 2013, until March 31, 2015, the date of his last major disciplinary conviction prior to his housing assignment to cell C-210. His disciplinary convictions included refusing to accept a housing assignment, threatening a staff member, sexual misconduct, attempting to establish an inappropriate relationship with a staff member, fighting with another inmate without injuries, and threatening to escape. *Id*. The most recent of these was his disciplinary conviction on March 31, 2015, for threatening a staff member. *Id*.

Prior to Rodgers' assignment to cell C-210, he received 22 major disciplinary convictions during his time at TDCJ. The period during which he received these convictions lasted from his entry into TDCJ on June 9, 2006, until November 6, 2015, the date of his last major disciplinary prior to his housing assignment to cell C-210. His disciplinary convictions included fighting with another inmate with injuries, verbal and physical staff assaults, possession of a weapon, and sexual misconduct. *Id*. The most recent of these was his disciplinary conviction on November 6, 2015, for fighting with another inmate. *Id*. His prior cellmate, Raymond Reyes ("Reyes"), stated that Rodgers always ate Reyes's meals, which consisted of beans, vegetables, and peanut butter, and always used Reyes's $25 of commissary for chips, soup, and large quantities of cookies and candy. (TDCJ-APP 43). Reyes admitted to fighting with Rodgers over who would clean up the cell and at which times. *Id*. Reyes also stated Rodgers was non-compliant in taking his medications. *Id*. Following Rodgers's death, Greggs was moved to Administrative Segregation. *Id*. at 1464.

### III.  Timeline of Assaults by Greggs and Indictment

Greggs admitted to assaulting Rodgers on several occasions between January 5 and January 17, 2016, the day before Rodgers was discovered unresponsive and subsequently declared dead. (P-APP 338–346). Specifically, Greggs was charged by indictment with five separate assaults on Rodgers, which allegedly occurred on January 5, 8, 9, 14, and 17 of 2016. (P-APP 338).[5]

#### A.  Defendant Interactions with Rodgers in January 2016, after Assaults

From November 30, 2015, until January 5, 2016, the door to cell C-210 remained closed. (P-APP 604–829). On January 5, TDCJ Correctional Officer Manuel Ramirez and TDCJ employees Charlie Gonzales and Autumn Venable opened the door to Rodgers's cell C-210 to escort him to have beard photographs taken, as he had permission to grow a beard. (TDCJ-APP 38). Mr. Gonzales described Rodgers as being "in good spirits" and "laughing" with other inmates on that day. *Id*. The logs reflect that the cell door of C-210 was opened at 12:14 p.m. to escort Rodgers to have beard photographs taken in the hallway. (P-APP 319). These logs indicate that C-210 was opened and closed again at 12:20 p.m. that same day to return Rodgers to the cell. *Id.*

In his initial interviews with OIG, Greggs repeatedly stated the first assault occurred on January 8, and that two additional assaults occurred on January 14 and January 17. (TDCJ-APP 6, 16, 221, 719). However, Greggs was indicted and charged with five separate assaults, with the first occurring on January 5, although the precise time of day when any of the fights occurred is unclear from the statements given. (P-APP 338). Although January 5 was the first day that Greggs

---

[5] Though it is not evidence, a recent pleading shows that Greggs pleaded guilty to five counts of aggravated assault corresponding to these dates. Federal Rule of Evidence 201 states that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." The Court has confirmed that Greggs pleaded guilty and, furthermore, the parties do not dispute the factual dates in the corresponding charging instruments of the criminal case with the dates the assaults occurred. However, there is no summary judgment evidence concerning which injuries occurred during which specific altercations. (The sole exception to this is the bruise observed on Rodgers's cheek on January 10, 2016, which necessarily occurred in a fight prior to that date.)

assaulted Rodgers, no one noticed any injuries to Rodgers when he was escorted for beard photos. This is possibly because the initial physical altercation between the cellmates had not occurred by this point in the day.

Correctional officers routinely failed to perform cell searches required by TDCJ policy for contraband in the ECB block at Clements Unit and routinely falsified cell search records to indicate such searches were performed. (P-APP 1013–1023). This misconduct occurred during the months that Greggs and Rodgers were housed together in cell C-210. *Id.* Correctional Officers Kayla Chapman (P-APP 980–981), Raul Bernal (P-APP 832), Curtis Taylor (P-APP 992–993), and Jason Dorsey (TDCJ-APP 1742–1748) testified that correctional officers at the Clements Unit engaged in "pencil-whipping." "Pencil-whipping" is the practice of falsely indicating that required duties — especially mandatory random cell searches — were performed when completing paperwork and forms. However, none of these individuals testified that *sergeants* or *supervisors* trained them to pencil-whip or that any sergeants or supervisors were directly aware of this behavior. Additionally, there is evidence that correctional officers or other individuals forged the sergeants' initials or signatures on these forms on some occasions. (P-APP 316).

The Court has reviewed the Security Search Logs provided by Patrick for the months of November and December 2015 and January 2016. (P-APP 420–603). The Court has also reviewed the cell door logs for the ECB pod for these same months, which show when and how long cell doors were open on a given day. (P-APP 604–829). The Court has further reviewed the comparison table of these logs and records generated by Patrick's counsel that show how often cell searches were performed and when correctional officers falsified Security Search Logs. (P-APP 1013–1023, 1025–1029). These records clearly indicate that correctional officers seldom performed required cell searches. They also clearly indicate that sergeants and supervisors initialed or signed the

11

Security Search Logs without actively confirming the searches for contraband were performed. Specifically, Sgt. Anderson was disciplined for signing cell search logs when searches were not completed. (P-APP 362). Sgt. Burkholder was disciplined for the same reason. (P-APP 364). Similarly, Sgt. Jackson was disciplined for a violation of PO-07.004 for failing to complete unannounced inspections of cell searches.[6] (P-APP 370). Finally, Sgt. Lucero was disciplined for signing cell search logs when searches were completed incorrectly. (P-APP 375).

Security cell searches of cell C-210 were scheduled nine times during November 2015 to January 2016. (P-APP 420–603). The searches were scheduled for November 9, 19, 21, and 25; December 8, 18, and 31; and January 6 and 14. *Id*. The January 6 and 14 searches in 2016 were scheduled on and near three significant dates — the day after the first altercation between Rodgers and Greggs (January 5), the day of the next-to-last altercation (January 14), and four days prior to Rodgers being found unresponsive (January 18).

On January 6, Correctional Officer Jason Dorsey stated that he performed a search of cell C-210, which Sgt. Lucero initialed as confirmed the same day. (P-APP 553). Sgt. Lucero disputed the legitimacy of these initials, which do appear to be different from initials he stated *were* legitimate. (P-APP 216). Nevertheless, he acknowledged that he wrongly initialed other cell searches without first confirming the search actually occurred. (P-APP 217). Additionally, on January 14, Correctional Officer Franco stated that he performed a search of cell C-210, which Sgt. Jackson initialed as confirmed the same day. (P-APP 569). Sgt. Jackson stated that his initials and signature were forged and that he did not complete any documentation on Security Search Logs during December 2015 or January 2016. (P-APP 893). The evidence also indicates that

---

[6] Jackson did not authorize incomplete cell searches, but rather failed to perform the requisite random check to ensure cell searches were being conducted.

correctional officers were not following proper procedures in conducting daily bed checks, medication distribution, and other types of searches. (P-APP 362–383).

On January 10, CMA Raper expressed a concern to an unidentified officer accompanying her during medical distribution regarding the lack of lighting in Rodgers's cell. The officer responded to her concern by stating that most inmates were workers that slept at different times and wanted their cells to be dark. (RAPER-APP 44–46). Additionally, on January 10, Officer Taylor noticed a bruise on Rodgers's cheek and failed to report the injury to his sergeant as required. (P-APP 996–1002). Sgt. Mogilnicki was the supervising sergeant on the ECB pod on January 10. *See* (P-APP 846). Sgt. Mogilnicki had knowledge that the prisoners on ECB were "close custody" prisoners that had a history of disciplinary problems and were more prone to fighting than some other cell blocks. (P-APP 869). Despite knowing this, Sgt. Mogilnicki failed to act when Officer Taylor reported signs of a future altercation with inmates in a different cell, intervening only when an actual fight occurred. (P-APP 996–1002). Based on this past interaction with Sgt. Mogilnicki, Officer Taylor did not report the injuries or possible altercation or initiate an inmate protection investigation when he observed Rodgers's injury. *Id.*

On January 11, CMA Raper again expressed her concern regarding the lack of lighting in Rodgers's cell, this time to a second unidentified officer accompanying her during medication distribution. The officer responded that most inmates were workers that slept at different times and wanted their cells to be dark. He further stated that the unit pod lights could not be turned on, though the inmates' personal cell lights could be. He also shined a flashlight into Rodgers's cell. (RAPER-APP 46–49, 66).[7]

---

[7] Information received from CMA Raper reflects that inmates *generally* preferred the main lights off and had the ability to turn on their individual cell lights. Additionally, correctional officers were equipped with flashlights to illuminate the cells while conducting rounds and performing job functions. (TDCJ-APP 635).

Officer Randal personally observed Rodgers as many as six times on January 17 — the day before Rodgers died — and personally interacted with Rodgers at least once that day. (P-APP 935–37, 974–75, 1024). On that same day, CMA Raper expressed concern to Officer Randal that Rodgers was always on his bunk, always on his side, and always facing the wall of his cell and also that his cell was always dark. (RAPER-APP 59–60, 78–82). Officer Randal could not recall whether he observed Rodgers under the covers of his bed or what Rodgers was wearing that day. (P-APP 936).

On January 17, both Rodgers and his cellmate told Officer Randal that Rodgers could not climb down from the top bunk of his bed due to his medication. (TDCJ-APP 2170–71). On that day, (1) Officer Randal directed Rodgers to roll over, (2) Rodgers did so, and (3) Officer Randal observed no signs of pain, bruising, injury, or emaciation. (TDCJ-APP 2172, 2186, 2210–12). Officer Randal responded to CMA Raper's concerns regarding Rodgers's lack of movement and the lack of lighting in Rodgers's cell by stating that: (1) he assumed the cell was dark because Rodgers had been working; (2) he heard two different identification numbers and two different names when she asked for inmate identification on that occasion; (3) just a few days before, Rodgers participated in a photography session and rose from his bed to take an identification photograph; and (4) TDCJ officers perform bed counts where the inmates have to get out of bed and come to the cell door. (RAPER-APP 59, 61). Based on these facts, CMA Raper assumed that Rodgers was sleeping on prior occasions when she observed him in the same position and did not interact with him. (RAPER-APP 59). Officer Randal explained these interactions with Rodgers to CMA Raper when she expressed her concerns to him on January 17 during medication distribution. Although she did not have similar interactions with Rodgers during her medication distribution

rounds on previous days, her concerns were alleviated by her understanding of Officer Randal's interactions with Rodgers during his rounds.

### B. Rodgers is Discovered Unresponsive in his Cell on January 18, 2016

At approximately 7:20 a.m. on January 18, 2016, Sgt. Anderson approached cell C-210 as part of his daily rounds and to assist with inmate recreation. (P-APP 1–2). While observing the inmates inside the cell, he noted Rodgers was unresponsive. *Id.* The door to cell C-210 was opened at 7:23 a.m. (P-APP 713). Officers arrived, placed Rodgers on a gurney, and wheeled him to the medical building. (P-APP 6–8 (Video Recording and Transcript of Recording)). At 7:26 a.m., CO3[8] Officer Gabriel Padilla ("Officer Padilla") was assigned to secure cell C-210 and 'document activity." (TDCJ-APP 770). At 7:40 a.m., CO3 Officer Kayla Chapman ("Officer Chapman") relieved Padilla from duty for ten minutes. *Id.* Cell C-210's door closed at 7:42 a.m. (P-APP 713). At 7:50 a.m., Padilla returned to resume the duty of guarding the cell. (TDCJ-APP 770). The cell remained closed and was observed by one or more of Officer Padilla, Officer Chapman, and Sgt. Anderson from 7:42 a.m. until the arrival of agents of the Texas Office of the Inspector General ("OIG") at 9:14 a.m. (P-APP 713, TDCJ-APP 770, TDCJ-APP 34).

### C. Notification of Warden Martin

At his deposition, Warden Martin testified that he first received a telephone call from Duty Warden Nash on the morning of January 18. (TDCJ-APP 1816). Nash informed Warden Martin that Rodgers was found non-responsive in cell C-210 and was in transit off unit. *Id.* Warden Martin further testified that he was *not* present at the Clements Unit at the time he received the phone call from Duty Warden Nash. *Id.* Warden Martin estimated that he arrived at the Clements Unit around 10:00 a.m. that morning. *Id.*

---

[8] For the purposes of this Memorandum Opinion, the abbreviation "CO3" refers to a third-class correctional officer.

Warden Martin testified that he was away from the Clements Unit the week prior and planned to take a holiday on Monday, January 18 — Martin Luther King Jr. Day — and Tuesday, January 19. (P-APP 386). Duty Warden Nash produced and emailed a timeline to Warden Martin on January 19 at 11:59 a.m. In the timeline, Nash indicated that Warden Martin was notified of the incident at 8:30 a.m. (TDCJ-APP 760, 764).   Warden Martin testified that he received further phone calls as the morning progressed and that the incident was "worse than we originally thought." (P-APP 385). This information persuaded him to cancel his holiday plans and drive to the Clements Unit. *Id.*

Warden Martin testified he arrived at the Clements Unit shortly after OIG arrived. *Id.* Warden Martin was scheduled to retire just two weeks after Rodgers's death, but upon TDCJ's request, he agreed to remain on duty and assist with the investigation into wrongdoing by staff members at his unit. (P-APP 387).

### D.  OIG Investigation Begins

OIG personnel did not arrive at the scene until after 9:00 a.m. on January 18. (TDCJ-APP 34). The OIG investigation into Rodgers's condition and eventual death began promptly at 9:14 a.m. when Roger Kendall ("OIG Kendall") arrived at the Clements Unit. (TDCJ-APP 34). OIG Kendall recalled the following:

> On January 18, 2016 I responded to the Clements Unit to assist with the investigation in this case. I went to the Expansion Cell Block (ECB), on the Clements Unit and took custody of cell C-210, from Correctional Sergeant Dustin Anderson at approximately 9:14 AM.

> I photographed the outside approach to the cell and also the interior of the cell. I searched the inside of the cell and found no evidence of a struggle or conflict. No evidence was collected from the cell at that time.

> At 9:29 AM, I received a state issued offender pair of pants and shirt from Correction Sergeant Brian Noak who had just removed those items from TDCJ Offender Joe Greggs.

At 10:01 AM, I received a state issued offender jumper from Correctional Officer Donald Teague who had recovered that item from the Clements Unit Infirmary after it was cut off of Offender Alton Rodgers during treatment. The clothing items and a CD containing a download of the photos taken will be held as evidence and forwarded to the OIG Region C Headquarters in Abilene, Texas, to be held as evidence.

On January 18, 2016 at 11:31 AM, I returned to ECB Cell C-210 and swabbed a stain from the ceiling over the top bunk of that cell. I swabbed the stain using sterile swab saturated in 0.9% Sodium Chloride Irrigation solution obtained from Clements Unit Medical Staff. The stain and swab had a light brown appearance. . ..

(TDCJ-APP 770).

Cell door logs indicate ECB cell C-210 was opened on the following dates and times between January 18 and January 22, 2016:

- 1/18/16: opens at 7:23 a.m., closes at 7:42 a.m.;

- 1/18/16: opens at 9:17 a.m., closes at 9:29 a.m.;

- 1/18/16: opens at 11:33 a.m., closes at 11:38 a.m.;

- 1/18/16: opens at 12:56 p.m., closes at 3:24 p.m.;

- 1/19/16: opens at 7:26 a.m., closes at 7:45 a.m.;

- 1/19/16: opens at 9:54 a.m., closes at 12:24 p.m.;

- 1/20/16: opens at 9:06 a.m. and immediately closes;

- 1/20/16: opens at 4:39 p.m., closes at 5:11 p.m.;

- 1/20/16: opens at 5:40 p.m., closes at 5:41 p.m.; and

- 1/22/16: opens and closes several times during Serious Incident Review.

(P-APP 713).

Several cell-door openings are omitted from the OIG investigative report, but all of these omissions occurred after: (1) photographs of the cell's condition were taken; (2) OIG viewed the cell; and (3) certain evidence was collected. No summary judgment evidence reflects that other

17

individuals entered the cell between the time Rodgers and Greggs were extracted and OIG arrived to take possession of it.

Officer Donald Teague provided OIG Kendall with the jumpsuit that Rodgers was wearing when he was found unresponsive. (TDCJ-APP 18, 34). The video cameras in the ECB were not always set to record, and they were not recording the C pod of the ECB on January 18. (TDCJ-APP 2). On that date, OIG Kendall collected the video evidence of Rodgers's removal from his cell and transportation to the medical department. (P-APP 6–8 (Video Recording and Transcript of Recording)).

### E.  Cleaning of the Cell by SSI Hefner

Inmate Jason Hefner was a support services inmate ("SSI") at the Clements Unit during the period surrounding Rodgers's death. He performed trustee duties, including janitorial work and reporting maintenance issues.

SSI Hefner learned of Rodgers's death *after* his own release from state custody. Believing he had information relevant to the case, SSI Hefner contacted Patrick's attorneys and eventually executed an affidavit recounting his work in cell C-210. In relevant part, the affidavit states that SSI Hefner cleaned cell C-210 on January 18 and recalls that the facility was poorly maintained. (P-APP 902–903). During his deposition, SSI Hefner further testified about his cleaning of the ECB block where Rodgers was incarcerated and the deplorable conditions therein — including the conditions in cell C-210. (P-APP 902–903). The Court discusses the specifics of Hefner's claims below in Section IV(B)(3) of this Memorandum Opinion.

Based on SSI Hefner's statements, Patrick alleges destruction of evidence, resulting in a denial of access-to-the-courts. The alleged lost evidence includes (1) video recordings, (2) bodily

fluid swabs, (3) Rodgers's mattress, and (4) the original condition of cell C-210. This alleged loss of evidence is discussed below in Section IV(B)(3).

### F. Serious Incident Review by Huntsville TDCJ

TDCJ expert witness Eric James Guerrero testified at deposition that it is common for local OIG investigators to "release" a cell after initially gathering evidence without waiting for TDCJ Huntsville to complete the Serious Incident Review. However, Guerrero clarified that OIG will not "release[]" the cell until they are persuaded that the evidence is collected. (P-APP 227). He further testified that local OIG investigators do not *customarily* send TDCJ an "official release" before janitorial staff are permitted to clean a cell — and did not do so before cleaning cell C-210. (P-APP 228). Here, summary judgment documents reflect that: (1) OIG investigators photographed cell C-210 on January 18, the date Rodgers was found unresponsive; (2) Deputy Warden Nash emailed Warden Martin *before* the cell was "released" to Clements Unit personnel for janitorial cleaning; and (3) TDCJ Huntsville completed the Serious Incident Review on January 22, 2016. (TDCJ-APP 760, 764, TDCJ-APP 770, TDCJ-APP 1458).

### G. Rodgers's Physical Condition and Autopsy Findings

Rodgers lost approximately 23 pounds — 14% of his total bodyweight — between October 13, 2015, when his weight was recorded at his psychiatric consultation, and January 18, 2016, the day he was discovered unresponsive in his cell. This weight loss led to his death. (P-APP 14–15, 18). No TDCJ employee that interacted with or observed Rodgers reported or documented any weight loss from November 2015 through January 18, 2016. Additionally, in the days (and potentially weeks) prior to January 18, he developed pneumonia, a very large bedsore, and pulmonary embolisms, or blood clots in the lungs. (P-APP 30–42). He also had visible injuries to his body, partially due to Greggs' assault. *Id.*

19

Greggs's assaults on Rodgers resulted in bruising, wounds, head fractures, blunt force trauma brain bleeding, and other injuries. (P-APP 15, 16, 18, 30). Rodgers's medical condition appeared very severe to those who treated him on January 18 after his removal from the cell. (P-APP 6, 8–11 (Video transcript)). Rodgers was found with a large, festering bed sore and appeared exceedingly thin. (P-APP 18). The medical records and autopsy indicate he was "cachectic," or malnourished, either by nature of an untreated medical condition or through insufficient nutrient intake. (P-APP 15, 30). Rodgers's ultimate cause of death was a brain bleed sustained during Greggs's assault. *Id.*

### H. Factual Allegations in Pleadings

Finally, the Court reviewed Patrick's Fifth Amended Complaint and weighed all factual allegations that are documented by consistent summary judgment evidence. (ECF No. 282).

### LEGAL ANALYSIS

In a civil case, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." FED. R. CIV. PROC. 56(b). When a summary judgment movant does not have the burden of proof on a claim, it can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it does so, the nonmovant must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue of material fact for trial. *See id.* at 324–25; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial.

*See TruGreen Landcare, L.L.C. v. Scott*, 512 F. Supp. 2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)). Specifically, when qualified immunity has been raised, "[t]he moving party is not required to meet [his] summary judgment burden for a claim of immunity." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks omitted) (citing *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)). Instead, "[i]t is sufficient that the movant in good faith pleads that [he] is entitled to qualified immunity. Once [he] asserts this affirmative defense, the burden shifts to the plaintiff to rebut it." *Id.* (internal quotation marks and emphasis omitted); *see also McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) (stating that "[o]nce qualified immunity is asserted, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense"); *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008) (noting that when a government official pleads qualified immunity, the plaintiff must "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct").[9]

Once the burden of proof shifts to the plaintiff, the plaintiff must negate qualified immunity. *Brown*, 623 F.3d at 253. This burden is not satisfied through a mere showing of "some metaphysical doubt as to the material facts" or by "conclusory allegations," "unsubstantiated

---

[9] Because Warden Martin, Sgt. Anderson, Sgt. Burkholder, Sgt. Lucero, Sgt. Jackson, Sgt. Mogilnicki, Officer Taylor, Officer Randal, and CMA Raper have asserted their entitlement to qualified immunity in their summary judgment motions, the burden has shifted to Patrick to demonstrate that they are *not* entitled to qualified immunity. *See, e.g.*, *McClendon*, 305 F.3d at 323.

assertions," or "only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Instead, on summary judgment, "the plaintiff can no longer rest on the pleadings . . . [, ]and the court looks to the evidence before it. . . ." *McClendon*, 305 F.3d at 323 (internal quotation marks omitted) (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). However, the court looks to this evidence "in the light most favorable to the plaintiff," *McClendon*, 305 F.3d at 323, with "all inferences . . . drawn in his favor." *Brown*, 623 F.3d at 253.

The Court now addresses Defendants' respective motions for summary judgment in the instant case. Its analysis involves the following steps:

First, because several defendants assert the defense of qualified immunity in their motions, the Court will restate the applicable test for determining whether a defendant is entitled to qualified immunity. Additionally, the Court will restate the applicable law regarding deliberate indifference to safety and health, as it is essential for evaluating several of the motions.

Second, the Court will examine the motions made by the correctional officer defendants and Defendant CMA Raper. It will apply the law regarding deliberate indifference to prisoners' safety and health to each of these defendants.

Third, the Court will examine the motions made by the sergeant defendants, applying the appropriate law regarding deliberate indifference to each sergeant defendant.

Fourth, the Court will examine the motion made by Defendant Warden Martin. It first will examine Patrick's deliberate indifference claim against Warden Martin and Warden Martin's Eleventh Amendment immunity defense to that claim. Then, it will examine Patrick's access-to-the-courts claim against Warden Martin.

In the fifth, sixth, and seventh steps of its analysis, the Court will examine the motions filed by TDCJ, TTUHSC, and the State of Texas. It will restate the applicable law regarding the ADA and the RA and then examine whether TDCJ, TTUHSC, and the State of Texas have violated it.

## I

In this section, the Court states the applicable law regarding qualified immunity and deliberate indifference to prisoners' safety and health.

### A.  Qualified Immunity under 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, private citizens may sue public officials in federal courts for violations of federal statutory or constitutional rights that those officials have committed against them. *See Monroe v. Pape*, 365 U.S. 167, 171 (1961). However, public officials enjoy an immunity from liability under Section 1983 known as *qualified immunity*. When properly applied to public officials, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 34l (1986).

Qualified immunity serves several important goals. Perhaps most crucially, courts have expressed a concern over "the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties." *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982); and *Scheuer v. Rhodes*, 416 U.S. 232, 239–41 (1974)). Qualified immunity therefore counters this deterrent by helping to protect public officials from liability. Additionally, qualified immunity helps to "avoid excessive disruption of government." *Malley*, 475 U.S. at 341 (internal quotation marks omitted). To this end, qualified immunity serves to terminate a claim against a public official as soon as possible in a judicial proceeding — even before discovery — "and permit the resolution of many insubstantial

claims on summary judgment." *Id.*; *see also Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (quoting *Harlow*, 457 U.S. at 818).

The Supreme Court has articulated a two-part test for determining if a "public official" is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, a court must determine whether the defendant's conduct violated a federal right. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Second, a court must determine "whether the right in question was 'clearly established' at the time of the violation." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Regarding the second part of the test, "[g]overnmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tolan*, 572 U.S. at 656 (internal quotations marks and citations omitted). More precisely, for a violation of clearly established federal rights to occur, "[p]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis in original omitted). If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. *See Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Malley*, 475 U.S. at 341). In essence, "the salient question . . . is whether the state of the law" at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 572 U.S. at 656 (citing *Hope*, 536 U.S. at 741). Finally, in order to qualify as "clearly established," the law in question should not be defined at a "high level of generality" but instead should be "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

As stated earlier, a qualified immunity defense alters the usual summary judgment burden of proof. *Brown*, 623 F.3d at 253. If the moving party in a summary judgment motion "plead[s] his good-faith entitlement to qualified immunity, the burden of proof shifts to the non-moving party to rebut it. *See Hathaway*, 507 F.3d at 319. It is the plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when that defense is raised. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). However, although "[t]he plaintiff bears the burden of negating qualified immunity, . . . all inferences are drawn in his favor." *Brown*, 623 F.3d at 253.

Pursuant to 42 U.S.C. § 1983, Patrick has sued Officers Taylor and Randal, CMA Raper, Sgts. Anderson, Lucero, Jackson, Mogilnicki, and Burkholder, and Warden Martin in his official capacity for violating Rodgers's federal rights. Specifically, she sues them for violating Rodgers's Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference toward his safety and health. These defendants have since asserted the defense of qualified immunity and moved for summary judgment on that ground. Therefore, to survive summary judgment, Patrick must raise a genuine issue of material fact with respect to both parts of the qualified immunity test. Since the first part requires an actual violation of federal rights, it is necessary to discuss the law regarding violations of the Eighth Amendment through deliberate indifference.

### B. Violation of the Eighth Amendment Through Deliberate Indifference to Prisoners' Safety and Health

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, and "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002)

(citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). This treatment and these conditions include includes both the safety and health of prisoners.

### 1. Deliberate Indifference to Prisoners' Safety

First, regarding safety, the Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other inmates. *Farmer*, 511 U.S. at 832. However, they are not expected to prevent all inmate-on-inmate violence. *Id.* at 834. A plaintiff making a claim for failure to protect from inmate-on-inmate violence must prove two elements. First, the plaintiff "must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999) (citing *Newton v. Black,* 133 F.3d 301, 308 (5th Cir. 1998)). This requirement of a substantial risk is the *objective* element of the claim. Second, the plaintiff must show "that prison officials were deliberately indifferent to his need for protection." *Jones*, 188 F.3d at 326. This requirement of deliberate indifference is the *subjective* element of the claim. *See Farmer*, 511 U.S. at 837 ("reject[ing] petitioner's invitation to adopt an objective test for deliberate indifference").

The deliberate indifference requirement is an extremely high standard to meet. *See Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004) ("We begin by emphasizing that our court has interpreted the test of deliberate indifference as a significantly high burden for plaintiffs to overcome."). A prison official acts with deliberate indifference to a substantial risk of serious harm "only if (A) he *knows* that inmates face a substantial risk of serious bodily harm *and* (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (emphasis added) (citing *Farmer*, 511 U.S. at 847); *see also Reeves v. Collins*, 27 F.3d 174, 176–77 (5th Cir. 1994).

Regarding (A), knowledge of deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995) (quoting *Farmer*, 511 U.S. at 837). By contrast, "[a]n official's failure to alleviate a significant risk that he *should have* perceived *but did not*, while no cause for commendation cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838 (emphasis added).

### 2. Deliberate Indifference to Prisoners' Health

Second, regarding health, the Eighth Amendment also imposes a duty on prison officials to provide adequate medical care to prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Courts have tended to analyze this duty under two distinct but related approaches.

The first approach follows the standards used to assess claims for failure to protect from inmate-on-inmate violence. Under this approach, a claim for failure to provide adequate medical care has both an objective and a subjective element. *See Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013) ("Eighth Amendment claims have objective and subjective components."). For the objective element, "[t]he plaintiff must prove objectively that he was exposed to a substantial risk of serious harm." *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002) (citing *Farmer*, 511 U.S. at 834). For the subjective element, "the plaintiff must show that jail officials acted or failed to act with deliberate indifference to that risk." *Id.*

The second approach places greater focus on the nature of the plaintiff's medical needs. Under this approach, "[a] plaintiff making a claim for failure to provide adequate medical care "must prove that care was denied and that this denial constituted 'deliberate indifference to serious medical needs." *See Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985) (quoting *Estelle*, 429 U.S. at 104). A serious medical need is "one for which treatment has been recommended or for

27

which the need is so apparent that *even a layman* would recognize that care is required." *Gobert*, 463 F.3d at 345 n.12 (emphasis added). "[T]he facts . . . must clearly evince the medical need in question and indicate that the denial of treatment was *much* more likely than not to result in serious medical consequences." *See Johnson*, 759 F.2d at 1238 (emphasis added).

Regardless of the approach used, the deliberate indifference requirement under either approach is similar to the deliberate indifference requirement for a claim of failure to protect from inmate-on-inmate violence. *See Farmer*, 511 U.S. at 837 (stating "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate *health* or *safety*" (emphasis added)). A showing of deliberate indifference requires the plaintiff to submit evidence that prison officials "refused to treat [the prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson*, 759 F.2d at 1238. Neither unsuccessful medical treatment, acts of negligence, medical malpractice, nor a prisoner's disagreement with his medical treatment, absent exceptional circumstances, constitute deliberate indifference. *See Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

For both ease of expression and conformity with existing case law, this Memorandum Opinion will use the phrase "claims for deliberate indifference to safety" and variants thereof to refer to claims for failure to protect from inmate-on-inmate violence. Similarly, this Memorandum Opinion will use the phrase "claims for deliberate indifference to health" and variants thereof to refer to claims for failure to provide adequate medical care.

### C.  The Law Regarding Deliberate Indifference Is Clearly Established

The preceding discussion is pertinent to overcoming the first part of the qualified immunity test: establishing that a federal right has been violated. To survive summary judgment, however, the second part of the test must also be overcome. Specifically, Patrick must show that the law regarding deliberate indifference to prisoners' safety and health was "clearly established" at the time of the incident. *See Tolan*, 572 U.S. at 656.

Here, the relevant law was clearly established.[10] In *Farmer*, *Estelle*, and the lines of cases following from each, the Supreme Court is clear that prison officials have duties to protect prisoners from violence and to provide them adequate medical care. They cannot be deliberately indifferent to their safety and health. As Section I(B) showed, the Court of Appeals for the Fifth Circuit has affirmed, followed, and expanded upon the holdings of the aforementioned cases. Every reasonable prison official would, in light of the law established by these cases, conclude that the conduct alleged by Patrick violates federal law. This Court finds that no officer of reasonable competence could disagree whether the alleged conduct violated Rodgers's rights. Patrick therefore has overcome the second part of the qualified immunity test.

Since the second part has been overcome, Patrick only has to raise a genuine issue of material fact as to the first part. That is, she only has to raise a genuine issue of material fact as to whether each defendant asserting qualified immunity did in fact violate Rodgers's Eighth

---

[10] Supreme Court justices and Fifth Circuit judges have recently criticized qualified immunity doctrine in select cases and controversies. *See, e.g.*, *Cole v. Carson*, 935 F.3d 444, 477 (5th Cir. 2019) (Ho and Duncan, JJ., dissenting), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, No. 19-753, 2020 WL 3146695 (U.S. June 15, 2020) ("[S]ome have criticized the doctrine of qualified immunity as a historical and contrary to the Founders' Constitution . . . . As originalists, we welcome the discussion."); *Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (Thomas, J., dissenting from denial of certiorari) ("I have previously expressed my doubts about our qualified immunity jurisprudence. . . . Because our § 1983 qualified immunity doctrine appears to stray from the statutory text, I would grant this petition." (citations omitted)). However, this recent jurisprudence and commentary does not affect the outcome or analysis in this case.

Amendment rights through acting with deliberate indifference to his safety and health. The Court now turns to the summary judgment evidence before it to answer this question.

## II

In this section, the Court examines the summary judgment motions made by Defendants Officer Taylor, Officer Randal, and CMA Raper. As stated in Section I(A), Patrick has sued these Defendants under 42 U.S.C. § 1983 for violating Rodgers's Eighth Amendment right to be free from cruel and unusual punishment. Specifically, Patrick alleges that Officers Taylor and Randal acted with deliberate indifference to his safety and health, while CMA Raper acted with deliberate indifference only to Rodgers's health. The Court begins by examining Patrick's claims of deliberate indifference to safety.

As noted earlier, Patrick's claim for deliberate indifference to safety has an objective element that she must establish. This objective element is not defendant-specific: it does not require a separate and particularized inquiry for each defendant. Consequently, the Court starts by determining whether Patrick is able to establish this element for summary judgment purposes.

### A. *Rodgers Was Incarcerated Under Conditions Posing a Substantial Risk of Serious Harm from Inmate-on-Inmate Violence*

To meet her summary judgment burden for the objective element of her claim for deliberate indifference to safety, Patrick must show that there is a genuine issue of material fact that conditions at the Clements Unit constituted a substantial risk of serious harm to Rodgers from inmate-on-inmate violence. The Court finds that she has met this burden based on the summary judgment evidence before it. The conditions under which Rodgers was incarcerated include, but are not limited to, the following.

First, Rodgers's cellmate Greggs assaulted Rodgers on five occasions and caused significant injuries to Rodgers as a result. (P-APP 15, 16, 18, 30, 338–346).

Second, Rodgers was "cachectic," or malnourished, due to either an untreated medical condition or insufficient nutrient intake. (P-APP 15). He also had a large bedsore when he was ultimately provided medical care and treatment for his injuries. (P-APP 18). Furthermore, there is evidence that Rodgers's malnourished condition occurred over the course of several days or weeks. (P-APP 40–42). This contributed to his inability to recuperate from injuries caused by violent interactions with his cellmate. *Id.* Indeed, as a result of this, Greggs ended up outweighing Rodgers, placing Rodgers in a disadvantaged position during any confrontation. (ECF No. 361-7 at 9).

Third, correctional officers were not diligent in performing required random cell searches on the ECB block at the Clements Unit that housed Rodgers. There are three sources of evidence for this conclusion.

To start, a demonstrative table produced by counsel for Patrick compares the cell searches that correctional officers claim to have performed with the cell door activity logs. (P-APP 1013–1023). This helps the Court determine if a logged or required cell search was actually performed. (P-APP 420–603, 604–829). The table reveals that correctional officers routinely failed to perform TDCJ-required cell searches for contraband in the ECB block at the Clements Unit. It further reveals that those correctional officers routinely falsified such records to indicate those type of searches were performed. *Id.* This behavior was known as "pencil-whipping." (P-APP 980).

Additionally, according to the deposition testimony of Officer Chapman, Officer Chapman and other correctional officers "wrote down" that they performed security searches "even if [they] didn't do it." (P-APP 980–981). This is a clear instance of pencil-whipping.

Finally, in his deposition testimony, Officer Taylor admitted to engaging in pencil-whipping of cell searches and improperly conducting bed book counts. (P-APP 992–993). Moreover, he indicated that when other correctional officers engaged in pencil-whipping, they

would "roll the door" to make it look like the door had been opened to conduct a cell search. This is because these correctional officers were aware that such searches were monitored. He further indicates that these correctional officers were attempting to hide such pencil-whipping behaviors from whoever monitored the "computerized records." *Id*. All of this evidence indicates that correctional officers failed to properly perform assigned cell searches.

Fourth, TDCJ procedures were also not followed regarding daily bed checks, medication distribution, and food distribution. Since these procedures are designed to ensure inmate welfare and safety, a failure to properly conduct them creates a risk of harm to inmates. This failure is established by the deposition testimony of several correctional officers.

Specifically, Officer Chapman indicated that other correctional officers mentoring her trained her improperly in conducting bed checks, medication distribution, and food distribution.[11] For example, Officer Chapman indicated that she was trained by Correctional Officer Raul Bernal ("Officer Bernal") not to properly conduct bed book counts. *Id.* In fact, her testimony indicates that she was aware of the need to visually inspect each inmate's identification card at the cell door when conducting such counts according to procedure. However, her testimony states that she was told by Officer Bernal that she only needed to verbally "get [the inmate's] name and number" instead of following this procedure. *Id.* The same lack of diligence and adherence to procedure occurred with medication distribution and food distribution. *Id.* Officer Bernal testified that he was trained to "just get through" bed book counts not by following proper procedures, but rather by promoting speed over diligence. (P-APP 832). Officer Randal testified that he believed he was

---

[11] TDCJ has policies and written guidance regarding the proper procedures to be followed in conducting bed checks and cell searches. (P-APP 350). TDCJ policy identifies a "cell search" as a "physical examination of an offender's assigned housing area for contraband." *Id*. Cell searches are required at least once per calendar month, with a list of cells to be searched designated by the warden or the warden's designee. (P-APP 351). Bed checks are required twice daily and are designed to determine that a "living, breathing" body is being counted at a particular location.

properly performing a cell search by simply visually inspecting the cell without ever opening the cell door at all. (P-APP 263–274).

All of this evidence shows that (1) Rodgers was injured by and in danger from other prisoners; (2) he was malnourished; and (3) the correctional officers did not perform the required cell searches, bed checks, and other safety observations of inmates in accordance with TDCJ policies. As outlined above, their failure to perform the basic functions of their jobs relating to prisoner safety resulted in a substantial risk of serious harm to inmates, including Rodgers. Patrick has therefore shown that there is a genuine issue of material fact as to whether Rodgers was incarcerated under conditions that posed a substantial risk of serious harm to him. Having determined this, the Court now turns to the motions of specific Defendants.

### B. Officer Taylor

Officer Taylor moves for summary judgment on Patrick's deliberate indifference claims against him in his individual capacity. First, Officer Taylor argues that Patrick's claim for deliberate indifference to safety fails because there is no evidence that he was subjectively aware of a substantial risk of serious harm to Rodgers. Second, Officer Taylor argues that Patrick's claim for deliberate indifference to health fails because there is no evidence that Officer Taylor was aware of and ignored Rodgers's serious medical needs. Officer Taylor contends that the failure of these claims means that there is no genuine issue of material fact that a violation of Rodgers's federal — in this case, constitutional—rights has occurred. Thus, Officer Taylor asserts entitlement to qualified immunity on both claims.

### 1.  Officer Taylor Was Deliberately Indifferent to Rodgers's Safety

As explained earlier, Patrick already has established the objective element of her deliberate indifference to safety claim against Officer Taylor. The Court now finds that she has also established the subjective element of that claim.

As stated in Section I(B)(1), the subjective element is met only if a prison official knows that an inmate faces a substantial risk of serious harm and disregards that risk by not taking reasonable measures to abate it.

Here, Officer Taylor knew that Rodgers faced a substantial risk of serious harm from other inmates but disregarded the risk. He knew that the ECB pod housed high-risk inmates. (P-APP 992–993). However, by his own admission, he engaged in the practice of pencil-whipping cell search logs and observed other correctional officers do the same. (P-APP 992–993). To engage in pencil-whipping is clearly a failure to take reasonable measures to abate the risk of violence between inmates.

Additionally, Officer Taylor saw an injury on Rodgers's cheek on January 10, 2016, but he failed to report this injury to his supervising sergeant as required. (P-APP 994–995). Despite believing that Sgt. Mogilnicki — his supervising sergeant on shift that night — would not have responded to the injury if informed of it, Officer Taylor nevertheless acknowledged that he should have reported it. *Id.*

The Court therefore finds that Officer Taylor has met the subjective element for Patrick's claim of deliberate indifference to safety. Hence, Patrick has successfully established both elements of her deliberate indifference to safety claim against Officer Taylor for summary judgment purposes.

### 2.  *Officer Taylor Was Not Deliberately Indifferent to Rodgers's Health*

The Court, however, does not find that Patrick has established her claim against Officer Taylor for deliberate indifference to health. As stated in Section I(B)(2), there are two approaches under which claims for deliberate indifference to health can be examined. However, under both approaches, Patrick would need to show that Officer Taylor acted with deliberate indifference to Rodgers. Specifically, she would need to show that he knew of and disregarded some serious medical need of Rodgers or a substantial risk of serious harm to his health.

Here, there is no summary judgment evidence that Officer Taylor even knew that Rodgers had a serious medical need or faced a substantial risk of serious harm to his health. The Court looks first at knowledge of serious medical needs.

Rodgers's weight loss does not qualify as a serious medical need because it would not have been obvious to Officer Taylor that treatment was needed for it. Moreover, there is no evidence that Officer Taylor was made aware of the need for treatment. For instance, there is no evidence that Rodgers requested assistance from Officer Taylor regarding his weight loss. There also is no evidence that Officer Taylor observed that he was unable to function due to his weight loss. Similarly, the bruise on Rodgers's cheek does not qualify as a serious medical need. A minor bruise would not have indicated any obvious medical need to a layman, but rather a safety need. Finally, there is no evidence that Officer Taylor had ever observed Rodgers experiencing any type of mental health crisis.

Regarding knowledge of risks to health, Officer Taylor did not know that Rodgers had any serious medical need, so he could not have known that he faced any substantial risk of serious harm to his health arising from any purported medical needs. And there is nothing else in the record that would indicate that some other substantial risk of serious harm to his health existed.

Again, as stated in Section I(B)(2), there are two approaches to deliberate indifference to health claims — one of which mirrors deliberate indifferent to safety claims and therefore has an objective and a subjective approach. Officer Taylor did not meet the subjective element of that approach because he did not act with deliberate indifference to Rodgers's health. Hence, the Court does not need to consider the objective element of that approach at all. Indeed, to resolve Patrick's claim under *both* approaches, it is instead sufficient to find Officer Taylor did not act with deliberate indifference to Rodgers's health. This is because if Officer Taylor did not with deliberate indifference to Rodgers's health in general, then he clearly did not act with deliberate indifference to his "serious medical needs." Consequently, Patrick has failed to establish her claim for deliberate indifference to health against Officer Taylor.

*     *     *

Therefore, the Court finds that Officer Taylor is not entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's safety, and his motion for summary judgment on this claim is DENIED. However, the Court finds that Officer Taylor is entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's health. Consequently, his motion for summary judgment on this claim is GRANTED, and this claim against him is DISMISSED with prejudice.

### C.  Officer Randal

Officer Randal moves for summary judgment on Patrick's deliberate indifference claims against him in his individual capacity. First, Officer Randal argues that Patrick's claim for deliberate indifference to safety fails because there is no evidence that he was subjectively aware of a substantial risk of serious harm to Rodgers. Second, Officer Randal argues that Patrick's claim for deliberate indifference to health fails because there is no evidence that Officer Randal was

aware of and ignored Rodgers's serious medical needs. Officer Randal contends that the failure of these claims means that there is no genuine issue of material fact that a violation of Rodgers's constitutional rights has occurred. Thus, Officer Randal asserts entitlement to qualified immunity on both claims.

### 1. Officer Randal Was Deliberately Indifferent to Rodgers's Safety

The standards that the Court used in Section II(B)(1) with respect to Officer Taylor apply to Patrick's deliberate indifference to safety claim against Officer Randal. Under those standards, Officer Randal, like Officer Taylor, is not entitled to qualified immunity on that claim.

Officer Randal knew that the ECB pod housed high-risk inmates and that it was not unlikely that they might injure one another. (P-APP 265–266). Nevertheless, according to his own testimony, he did not require inmates to get out of bed to perform bed checks, despite the training he received in how to properly conduct a bed check. (P-APP 263–274). He also did not open cell doors during cell searches, despite indicating he did so on the logs. *Id.* In fact, between November 2015 and January 18, 2016, Officer Randal indicated that he completed nineteen cell searches, none of which actually resulted in opening a cell door. *Id.*

Hence, like Officer Taylor, Officer Randal knew that Rodgers faced a substantial risk of serious harm from other inmates and disregarded that risk. Consequently, the Court finds that Officer Randal has met the subjective element for Patrick's claim of deliberate indifference to safety. Patrick has therefore successfully established both elements of her claim for summary judgment purposes.

### 2. Officer Randal Was Not Deliberately Indifferent to Rodgers's Health

The standards that the Court used in Section II(B)(2) with respect to Officer Taylor also apply to Patrick's deliberate indifference to health claim against Officer Randal. Under those

standards, Officer Randal, like Officer Taylor, is entitled to qualified immunity on that claim. This is because there is no summary judgment evidence that Officer Randal even knew that Rodgers had a serious medical need or faced a substantial risk of serious harm to his health. The Court starts with knowledge of serious medical needs.

Patrick's claim concerns Officer Randal's conduct during a bed check of Rodgers's cell on January 17, 2016. Under TDCJ policy, correctional officers must require prisoners in a cell to get out of or down from beds during bed checks. When Officer Randal requested this while performing a bed check of Rodgers's cell, both Rodgers and Gregg told Officer Randal that Rodgers could not climb down from the top bunk of their bed due to Rodgers's having been medicated for that evening. (TDCJ-APP 2170–71). According to his testimony, Officer Randal decided not to require Rodgers to climb down because in his experience, it was unsafe to require medicated inmates to climb down from the top bunk of their beds. (TDCJ-APP 2136–38, 2181–85). Indeed, the summary judgment record indicates that Officer Randal had once observed a medicated inmate almost injure himself while climbing out of bed. *See* (TDCJ-APP 2184–85). Because of this, Officer Randal instead asked Greggs to bring him Rodgers's identification card. (TDCJ-APP 2185). He then told Rodgers to turn over in the bed and state his name and number so that they could be matched with the card. *Id.*

In doing this, Officer Randal did indeed fail to comply with TDCJ policy regarding bed check. However, his failure does not rise to the level of deliberate indifference because there is no evidence that he knew of but disregarded a serious medical need of Rodgers. Rodgers's inability to climb out of bed due to being medicated for the night would not indicate to a layman that he had a serious medical need that required treatment. The fact that Rodgers received injuries leading to his death the following day does not affect this point. The injuries that he received from Gregg

probably were inflicted during the night of January 17, 2016 — after Officer Randal had completed the bed check. Hence, Officer Randal would not have been able to know about those injuries — let alone disregard them.

Regarding knowledge of substantial risks to health, Officer Randal did not know that Rodgers had any serious medical need, so he could not have known that he faced any substantial risk of serious harm to his health arising from any purported medical needs. And there is nothing else in the record indicating that some other substantial risk of serious harm to his health existed.

Like Officer Taylor, Officer Randal did not act with deliberate indifference to Rodgers's health. Hence, as with Officer Taylor, the Court does not need to consider the objective element under any approach to claims for deliberate indifference to health. Consequently, Patrick has failed to establish her claim for deliberate indifference to health against Officer Randal.

\*      \*      \*

Therefore, the Court finds that Officer Randal is not entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's safety, and his motion for summary judgment on this claim is DENIED. However, the Court finds that Officer Randal is entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's health. Consequently, his motion for summary judgment on this claim is GRANTED, and this claim against him is DISMISSED with prejudice.

### D.  CMA Raper

CMA Raper moves for summary judgment on Patrick's deliberate indifference to health claim against her. CMA Raper argues that Patrick's claim of deliberate indifference to health fails because there is no evidence that CMA Raper acted with deliberate indifference to Rodgers's health. Consequently, CMA Raper contends that she is entitled to qualified immunity on this claim

because there is no genuine issue of material fact that a violation of Rodgers's constitutional rights has occurred.

The Court finds that CMA Raper is entitled to qualified immunity on this claim and GRANTS her motion for summary judgment on it. Specifically, the Court finds that Patrick has not raised a genuine issue of material fact that CMA Raper acted with deliberate indifference to Rodgers's health.

As stated in Section I(B)(2), there are two approaches for examining claims for deliberate indifference to health. But regardless of which approach is used, Patrick would need to show that CMA Raper acted with deliberate indifference to Rodgers in some form. Specifically, she would need to show that CMA Raper knew of and disregarded some serious medical need of Rodgers or a substantial risk of serious harm to his health.

Here, CMA Raper's conduct did not amount to deliberate indifference. It is true that the correctional officer escorting CMA Raper did not follow proper TDCJ procedure in distributing medication to Rodgers by having him open the cell door to take the medication. (TDCJ-APP 1193). But a failure to follow this procedure does not, by itself, rise to the level of deliberate indifference. At best, it is just *negligence*. Additionally, medication aides such as CMA Raper are under no duty or expectation to assess a patient's health status as they deliver medication (TTTUHSC-APP 11). The correctional officer's failure to follow TDCJ procedure cannot be imputed to CMA Raper.

The Court also rejects the argument that CMA Raper knew of and disregarded a serious medical need of Rodgers or a substantial risk of serious harm to his health when she personally observed Rodgers. The summary judgment evidence indicates that CMA Raper personally observed Rodgers on January 10, 11, 12, 13, 14, and 17 of 2016 while distributing medications to inmates in the Clements Unit. On three of those days — January 10, 11, and 17 — she expressed

concern to the officer accompanying her that Rodgers's cell was always dark.[12] Each time, the officer responded by stating that, usually, the inmates were workers that slept at different times and that they wanted their cells to be dark.[13] On January 17 in particular, Officer Randal also told her that (1) he heard two different identification numbers and voices when she asked for inmate identification; (2) Rodgers had gotten up to take his new inmate identification picture only a few days prior; and (3) TDCJ officers perform bed counts that require inmates to come to the cell door. (RAPER-APP 59, 61). CMA Raper also heard two different identification numbers and two different voices when she asked Rodgers and his cellmate for inmate identification, which led her to assume that she had heard Rodgers speak. Although she was unable to see Rodgers's face or body due to Rodgers facing the wall, his bedsheets, and the lack of lighting in his cell, *see* (RAPER-APP 61–62, 65, 82), she "assumed [Rodgers] was asleep" based on what Officer Randal told her. *See* (RAPER-APP 59, 61).

The Court finds that even when viewed in a light most favorable to Patrick, this evidence would not be sufficient for a reasonable jury to find that CMA Raper knew and disregarded that Rodgers had a serious medical need or faced a substantial risk of serious harm to his health. This is for the following two reasons:

First, regarding serious medical needs, while CMA Raper did observe Rodgers's lack of movement, there is nothing in the record suggesting that it would have been obvious to her that

---

[12] On January 10, 2016, CMA Raper delivered medications to Rodgers's cell. *See* (RAPER-APP 64, 80). At the time, she expressed her concern to an unidentified accompanying correctional officer that Rodger's cell was always dark. *See* (RAPER-APP 44). The next day on January 11, she again delivered medications to Rodgers's cell, *see* (RAPER-APP 64, 80), and again expressed the same concern to a different unidentified officer with her. *See* (RAPER-APP 45–46). Finally, on January 17, the day before Rodgers died, she expressed the same concern to yet a third officer — Officer Randal — while distributing medication, adding this time that Rodgers was always on his bunk, always on his side, and always facing the wall of the cell. *See* (RAPER-APP 59–60, 78–82).

[13] The officer accompanying CMA Raper on January 11, 2016, also told her that only the inmate's personal cell lights — and not the unit pod lights — could be turned on and shined his flashlight in Rodgers's cell. (RAPER-APP 46).

the motionlessness was due to some serious medical need. To the contrary, she had been told by Officer Randal that the cellmates worked, from which she inferred that Rodgers was sleeping.

Second, regarding risks to health, CMA Raper assumed that Rodgers had spoken during medication distribution, and nothing before the Court suggests that she was ever informed of any risk of harm to Rodgers's health, let alone a substantial one. And as stated earlier, she concluded that Rodgers's lack of movement was due to his sleeping rather than any such risk of harm.

Perhaps most importantly, even if CMA Raper did know about Rodgers's serious medical needs or about substantial risks of serious harm to his health, the record clearly shows that she did *not* disregard them. Instead, she repeatedly voiced her concerns to the officers accompanying her about the lack of lighting in Rodgers's cell, and she voiced her concern about Rodgers's lack of movement to Officer Randal. And every time she voiced a concern, she was provided an explanation that assuaged it. Perhaps she should have done more, but no reasonable jury could conclude that she *disregarded* any medical needs or risks. At most, the evidence shows that she was negligent, not deliberately indifferent.

Since CMA Raper did not act with deliberate indifference to Rodgers's health, the Court does not need to consider the objective element under any approach to claims for deliberate indifference to health. To resolve Patrick's claim under any approach, it is sufficient to find that CMA Raper did not act with deliberate indifference to Rodgers's health. Hence, Patrick has failed to establish her claim for deliberate indifference to health against CMA Raper.

*    *    *

Therefore, the Court finds that CMA Raper is entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's health. Consequently, her motion for summary judgment on this claim is GRANTED, and this claim against her is DISMISSED with prejudice.

**III**

In this section, the Court examines the summary judgment motions made by Defendants Sgt. Anderson, Sgt. Burkholder, Sgt. Lucero, Sgt. Jackson, and Sgt. Mogilnicki (collectively, "the sergeants"). As stated in Section I(A), Patrick has sued the sergeants under 42 U.S.C. § 1983 for violating Rodgers's Eighth Amendment right to be free from cruel and unusual punishment. Specifically, Patrick alleges that the sergeants acted with deliberate indifference to Rodgers's safety and health.

It is an established rule that there is no vicarious or respondeat superior liability of supervisors — such as the sergeants — under 42 U.S.C. § 1983. *See Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987) ("Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.") (citations omitted). Hence, the sergeants here cannot be held vicariously liable for any of the constitutional violations committed by the correctional officers they were supervising.

"However, a supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation" *Id.* at 304 (citing *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir. 1985)). Consequently, to establish her claims against the sergeants for deliberate indifference to safety and health, Patrick must show at least one of two things. She must show either that the sergeants were personally involved in the constitutional deprivation that Rodgers suffered *or* that they performed some wrongful conduct that has a sufficient causal connection with that deprivation. The Court begins by analyzing Patrick's arguments for the latter.

### A.  *The Sergeants Are Not Liable for Implementing a Policy That Deprived Rodgers of His Constitutional Rights*

Patrick argues that the sergeants acted with deliberate indifference to Rodgers's safety and health by perpetuating and participating in a widespread systemic failure to adequately perform duties. The Court understands Patrick here to be arguing the following. Even if the sergeants were not personally involved in the deprivation of Rodgers's constitutional rights, they are still liable for that deprivation. And this is because their perpetuation and participation in the alleged systemic failure described above constitutes wrongful conduct that has a sufficient causal connection with Rodgers's deprivation.

The Court rejects this argument because there is no sufficient summary judgment evidence that the sergeants implemented whatever policy led to this alleged failure. "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Thompkins*, 828 F.2d at 304 (citations omitted). When a supervisor does not knowingly disregard the safety or health of a specific defendant, he cannot be held liable unless he failed to correct a policy he knew was unconstitutional *and* his failure to correct it caused the defendant's injuries. *See id.* (stating that if the defendant "did not knowingly disregard [the plaintiff's] pleas to see a doctor, he cannot be held liable unless he knew the jail's system was so deficient as to expose prisoners to substantial risk of significantly unmet serious medical needs—*i.e.,* was unconstitutional—and failed to properly attempt to correct it, *and* unless his action or inaction in this respect caused Thompkins' injuries" (emphasis in original)).

Here, Patrick has not provided sufficient evidence that the sergeants implemented any policy that resulted in a violation of Rodgers's constitutional rights. Patrick attempts to argue that

the pervasiveness of pencil-whipping by correctional officers and the obviousness of the risks it poses to Rodgers's safety and health are sufficient circumstantial evidence to show that the sergeants had implemented a deficient supervisory policy. But the Court rejects this argument for the following three reasons.

*First*, the testimony of the correctional officers who were supervised or trained by these sergeants does not indicate a policy of tolerating or even an approval of the pervasive pencil-whipping. Instead, it at most indicates some knowledge of understaffing and some knowledge about the *possibility* that pencil-whipping *may* occur in such situations. As outlined in III(B)(iii), none of this is evidence of any direction or approved custom to falsify logs or fail to perform cell searches. *Second*, the correctional officers at times appeared to take affirmative steps to hide their pencil-whipping behavior from their sergeants. This indicates that they knew that their sergeants would disapprove of their actions if the sergeants found out about it. *Third*, there is no evidence that correctional officers went unpunished if their sergeants discovered that they were pencil-whipping.

Patrick also attempts to argue that this case is analogous to *Pugh v. Rockwall Cty.*, CIV. A. 3:98-CV-2142-P, 2000 WL 730426 (N.D. Tex. May 19, 2000) (unreported). In *Pugh*, a pre-trial detainee plaintiff sued a jail administrator defendant for implementing a policy where jailers would fail to visually inspect, count, protect, and document prisoners, which resulted in harm to the plaintiff. The court denied the defendant's motion for summary judgment on the basis of qualified immunity, finding that the plaintiff had raised genuine issues of material fact as to whether a deficient policy had been implemented. However, this Court notes two important differences between *Pugh* and the instant case.

First, the appropriate standards for *Pugh* and the instant case are different. For pretrial detainees, a condition or restriction of pretrial detention that is not reasonably related to a legitimate government objective constitutes an unconstitutional punishment. *See Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998) ("Conversely, if a restriction or condition is not reasonably related to a legitimate [government] goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)). "This standard is contrasted with the requirement of 'deliberate indifference', which has been employed in cases involving *prisoner* claims of Eighth Amendment violations . . . ." *Hare*, 135 F.3d at 326 (citing *Estelle*, 429 U.S. at 104–05). The standard for pretrial detention is higher than the deliberate indifference standard for prisoners. *See Hare*, 135 F.3d at 327 (stating that the standard of care for pretrial detention claims is at minimum deliberate indifference but suggesting that it is actually somewhere between deliberate indifference and negligence). This means that the appropriate standard in *Pugh* is more demanding. Hence, even if the facts in *Pugh* and the instant case were essentially the same, this does little to show that the Court should reach the same outcome in this case as in *Pugh*.

Second, in *Pugh*, the defendants' subjective awareness of the prisoners' safety differed from the Defendants' subjective awareness in the instant case. The defendants in *Pugh* were clearly aware of the safety risks to the prisoners and disregarded them. *Pugh*, 2000 WL 730426 at *9–10. The facts in that case indicate that "[the defendant] knew that these maximum-security inmates were not being regularly monitored or even checked. In fact, [he] knew that the jailers were falsifying the hall log, which may cause outside observers . . . to believe the inmates were being observed more regularly." *Id.* at *10.  By contrast, the summary judgment evidence in this case

indicates that out of the sergeants, only Sgt. Burkholder can be said to have had a comparable mental state, at least as it pertains to pencil-whipping. As outlined below, only Sgt. Burkholder might have had knowledge that the correctional officers were falsifying records or failing in their duties to monitor inmates.

Thus, *Pugh* is distinguishable from the instant case in very important respects. For all the reasons discussed above, the Court finds that the sergeants are not liable for implementing a deficient policy that deprived Rodgers of his constitutional rights.

### B. Some Sergeants Are Liable for Depriving Rodgers of Constitutional Rights

Patrick also argues that the sergeants were personally involved in the deprivation of Rodgers's constitutional rights. Specifically, she argues that they acted with deliberate indifference to Rodgers's safety and health by failing to properly oversee the correctional officers who ultimately engaged in pencil-whipping in the Clements Unit where Rodgers was housed. The Court finds that Patrick has raised a genuine issue of material fact as to whether Sgts. Burkholder and Mogilnicki personally deprived Rodgers of his constitutional rights in this manner. It does not, however, find that she has done so with respect to the other sergeants.

In presenting its reasoning for this conclusion, the Court begins by stating the standards for supervisory liability when a supervisor is personally involved in the deprivation of constitutional rights. Then, it restates relevant background facts about the sergeants' duties and conduct. Finally, it examines the liability of the sergeants, collectively and individually.

### 1. Supervisory Liability When Supervisors Are Personally Involved in the Deprivation of Constitutional Rights

It is first necessary to state the applicable law regarding supervisory liability when a supervisor is personally involved in depriving a defendant of his constitutional rights. When a supervisor deprives a defendant of rights in this fashion, it is through a failure to adequately

supervise or train. A three-part test exists to determine whether a supervisor's failure to adequately supervise or train constitutes deliberate indifference. Specifically, "[i]n a Section 1983 claim for failure to supervise or train, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty*, 571 F.3d 388, 395 (5th Cir. 2009) (internal quotation marks omitted) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).

The standard for deliberate indifference in the third part of the *Goodman* test is identical to the standard discussed in I(B)(i). Specifically, "[f]or an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Goodman*, 571 F.3d at 395. (internal quotation marks omitted) (citing *Smith*, 158 F.3d at 912). Then, knowing that there is a substantial risk of serious harm, he must disregard that risk. *See Farmer*, 511 U.S. at 837 (stating "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety").

"To establish deliberate indifference, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation. . . . Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability." *Goodman*, 571 F.3d at 395 (internal quotation marks and citations omitted).

With this law in place, it is appropriate to examine the relevant facts pertaining to the sergeants' duties and conduct.

### 2. *Background Regarding the Sergeants' Duties and Conduct*

On September 15, 2014, TDCJ issued Security Memorandum SM-03.02 (rev. 5), which was the policy in place regarding randomized cell searches during the times relevant to this lawsuit. (P-APP 350). This policy defines a "cell search" as a "physical examination of an offender's assigned housing area for contraband." *Id*. Cell searches are required at least once per calendar month, with a list of cells to be searched designated by the warden or the warden's designee. (P-APP 351). Correctional officers document a cell search on a "Security Search Log," indicating cells searched for the day and any contraband found. *Id*. Security supervisors are required to "randomly" examine completed cell searches to ensure these searches were properly completed by correctional officers as indicated by the Security Search Log. *Id*. A "random" examination can be performed by observing the search, reviewing video footage of the search, or performing a follow-up search of the cell. *Id*. When a supervisor performs a random cell search confirmation by one of these methods, the supervisor must indicate the search was properly performed. The supervisor must do this by initialing the Security Search Log in the appropriate box next to the original entry of the cell search that was conducted. *Id*.

TDCJ also issued Post Order PO-07.005 (rev. 7) to outline the specific duties of sergeants in complying with SM-03.02 (rev. 5). (TDCJ-APP 981–982). This post order indicates that sergeants are responsible for being the first line of supervisors to confirm that correctional officers properly performed cell searches. Specifically, they are to randomly examine an unspecified number of searches performed on a shift by the correctional officer under their supervision. *Id*.

TDCJ also issued PO-07.004 (rev. 8) to outline the specific duties of lieutenants in complying with SM-03.02 (rev. 5). (TDCJ-APP 945). This order requires lieutenants to conduct "frequent" and "unannounced" inspections of all areas where staff are assigned and to ensure

49

adequate staff are assigned to perform all essential functions. *Id*. Lieutenants also can sign Security Search Logs and are required to ensure "cell searches, common area searches, and cell inspections" are conducted in accordance with SM-03.02. (TDCJ-APP 946).

The Court has reviewed the Security Search Logs that Patrick provided for the months of November and December 2015 and January 2016. (P-APP 420–603). The Court was also provided the cell door logs for the ECB pod for these same months, which indicate when and how long cell doors on the ECB pod were opened on a daily basis. (P-APP 604–829). The Court has also reviewed the comparison table of these logs and records generated by Patrick's counsel that indicates how often cell searches were not performed and when Security Search Logs were falsified by correctional officers. (P-APP 1013–1023, 1025–1029). These records clearly indicate that correctional officers were not performing these cell searches much of the time. They also clearly indicate that sergeant or lieutenant supervisors were frequently initialing or signing Security Search Logs without actively confirming that searches for contraband were performed.

Security cell searches were scheduled nine times during November and December 2015 and January 2016 for cell C-210 — Rodgers's and Greggs's cell. (P-APP 420–603). These searches were scheduled for November 9, 19, 21, and 25, December 8, 18, and 31, and January 6 and 14. *Id*. The Court specifically notes that two security searches were scheduled on C-210 during the month of January 2016. *Id.* Since these were after the first assault by Greggs is shown to have occurred, the Court examines both closely.

First, on January 6, Correctional Officer Jason Dorsey indicated he performed a search of cell C-210, which was initialed as confirmed by Sgt. Lucero that same day. (P-APP 553). Sgt. Lucero disputes the legitimacy of these initials, which do appear to differ from initials that he

indicated were legitimate. (P-APP 216). Nevertheless, he acknowledges that he wrongly initialed other cell searches that he did not personally confirm through proper procedures. (P-APP 217).

Second, on January 14, Correctional Officer Franco indicated that he performed a search of cell C-210, which was initialed as confirmed by Sgt. Jackson that same day. (P-APP 569). Sgt. Jackson claimed that his initials and signature were forged and that he had not completed any documentation on Security Search Logs during the months of December 2016 or January 2016. (P-APP 893).

In light of the summary judgment evidence before it, the Court finds that Patrick has raised a genuine issue of material fact that the sergeants' supervision over all of these searches was inadequate. This is because the officers beneath them engaged in widespread pencil-whipping. It also finds that these searches could have revealed evidence of inmate-on-inmate violence involving Rodgers. Finally, the Court finds that she has raised a genuine issue of material fact as to whether these searches could have prevented violence against Rodgers or his death. After all, *if* a failure to supervise or train correctional officers regarding any searches led to Rodgers's attacks and eventual death, then it would be regarding *these* searches.

Consequently, Patrick has raised a genuine issue of material fact as to the first two parts of the *Goodman* test. She has shown that there is a genuine issue of material fact as to whether the sergeants failed to supervise or train and whether this failure led to the deprivation of Rodgers's constitutional rights. The only question remaining for the Court is whether there is a genuine issue of material fact as to the third part of the test: whether the sergeants' failure to supervise or train amounted to deliberate indifference. The Court now turns to the sergeants' subjective awareness of the correctional officers' pencil-whipping.

### 3. *Some of the Sergeants' Failure to Supervise or Train Amounted to Deliberate Indifference to Rodgers's Safety*

To determine the sergeants' subjective awareness of their subordinates' pencil-whipping, the Court examines the sergeants collectively and then individually.

Regarding the sergeants collectively, Patrick argues that because the sergeants knew the Clements Unit was understaffed, they were aware of the pencil-whipping that occurred as a result of the understaffing. The Court rejects this argument and finds that the sergeants did not have subjective awareness of pencil-whipping *merely* from knowledge of understaffing.

Correctional Officer Jason Dorsey ("Officer Dorsey") testified that sergeants had knowledge of understaffing issues in regard to cell searches. (TDCJ-APP 1742–1748). Officer Dorsey stated that three individuals were needed to conduct a proper cell search on the C-pod, due to security concerns. *Id*. Frequently, only one officer would walk the pod due to the need for officers in the administrative segregation unit and other areas of the prison. *Id*. Despite this, when sergeants were contacted about the inability to conduct a search due to lack of staffing, the sergeants would either respond "it needs to be done," or they would come down themselves to the pod to assist with the search. *Id*. Officer Dorsey admitted that such searches were not always performed, but he did not know if sergeants were aware of this fact. *Id*. Officer Bernal testified that he frequently failed to perform cell searches as required, but he too did not indicate that any sergeants were aware of this failure. (TDCJ-APP 1764–1765). Officer Chapman testified that it was other correctional officer mentors, including Officer Bernal, who instructed her not to follow procedures in bed book count and in Security Search Logs. (TDCJ-APP 2280–2282). It was *not* sergeants, captains or majors. *Id.* The Court also notes the deposition testimony of Officer Taylor, which stated that he did not know if the sergeants knew that cell searches were not performed because they were not on the pod during any of the searches. (P-APP 992–993). Officer Taylor

also testified that he never observed a sergeant or supervisor participate in the "door rolls" other officers used to avoid actually searching a cell. (P-APP 993).

There is nothing in this collective testimony before the Court indicating that any sergeants ever told subordinates to pencil-whip forms or otherwise fail to perform searches. Rather, the general response by the sergeants when asked was to "get it done" or that help would be sent. No correctional officer indicated that the sergeants had an attitude of deliberate indifference to the practice of pencil whipping. It also does not follow from the sergeants' awareness of the understaffing that they knew their orders to "get it done" in conducting cell searches were ignored. After all, the testimony in the record indicates that the sergeants would assist in searches on occasion and that the correctional officers would sometimes perform the search with insufficient backup at risk to themselves. (P-APP 216–218). Although searches were frequently not performed, this circumstantial evidence is insufficient to impute knowledge to the sergeants about this practice. This is especially true given the testimony of the direct orders by sergeants in general to perform the tasks when confronted with understaffing issues.

Four of the five sergeants in this lawsuit received disciplinary action because of their failure to adequately conduct random checks to ensure cell searches were properly performed. Specifically, Sgt. Anderson was disciplined for signing cell search logs when searches were not completed. (P-APP 362). Sgt. Burkholder also was disciplined for the same reason. (P-APP 364). Sgt. Jackson was disciplined for a violation of PO-07.004 in failing to complete unannounced inspections of cell searches. (P-APP 370). Sgt. Lucero was disciplined for signing cell search logs when searches were completed incorrectly. (P-APP 375).[14] In addition, one major was terminated, two captains were disciplined, three lieutenants were disciplined, one additional sergeant not a

---

[14] By contrast, Sgt. Mogilnicki does not appear to have been disciplined for this type of incident.

party to this suit and ten correctional officers were disciplined, and one correctional officer resigned from his position. (TDCJ-APP 148–149). However, based on the post orders these various officers were found to have violated, these disciplinary proceedings did not require a finding of subjective knowledge of the violation.

Thus, Patrick has not raised a genuine issue of material fact through disciplinary records or other summary judgment evidence that the sergeants collectively acted with deliberate indifference to Rodgers's safety or health by their failure to adequately supervise the correctional officers under them.

Regarding the sergeants individually, the Court examines each sergeant in the following subsections. It finds that only Sgt. Burkholder's and Sgt. Mogilnicki's failure to supervise or train amounted to deliberate indifference.[15]

### a. Sgt. Anderson

Sgt. Anderson testified that he properly supervised his subordinates concerning bed checks and cell searches and was not aware that some may have failed to adequately perform their duties under his supervision. (P-APP 854–855). Specifically, Sgt. Anderson indicated that if an inmate did not get out of his bunk when a correctional officer was performing a bed book count, he would go to the pod and check on the inmate by instructing him to come to the cell door. *Id*. Additionally, Sgt. Anderson testified that he would personally observe bed book counts a few times a week, if not daily, to make sure his subordinate officers were performing them correctly. *Id.* He never observed them performing the bed book counts incorrectly. *Id*. When confronted with concerns

---

[15] As the Court's analysis indicates, the sergeants performed their duties with varying degrees of oversight. The Court agrees that as the level of oversight and supervision by the sergeants *on the pod* during the shift decreased, the likelihood of pencil-whipping behavior by that sergeant's subordinate correctional officers increased. It is reasonable to also consider whether an individual sergeant had knowledge of pencil-whipping behaviors by correctional officers on the Clements Unit based on the time each sergeant spent overseeing these officers during the performance of their duties on the pod.

from his subordinates regarding time constraints, Sgt. Anderson stated that he told them to "take as much time as [they] need to get it done." *Id*. When deposed about the practice of pencil-whipping at the Clements Unit, Sgt. Anderson denied any knowledge of such practices:

> Q.   During the time that you were a sergeant in ECB, 2015, 2016 time period, did you ever discover that cell search logs were being filled out without cell searches being done?
>
> A.   No.

*Id*. Admittedly, Sgt. Anderson acknowledged that he would sign and initial the cell search logs of his subordinates without visually observing them complete the cell searches. *Id.* But he did this because he believed that his signing or initialing was only an indication that the searches had been performed, not that he had witnessed them being performed. *Id*. No inference can be drawn that he signed off or initialed the cell search logs with a subjective awareness of pencil-whipping.

The Court concludes that Patrick has failed to raise a genuine issue of material fact that Sgt. Anderson had a subjective awareness of the pencil-whipping behaviors of his subordinate officers. Hence, Patrick has failed to meet her summary judgment burden on the third part of the *Goodman* test as it pertains to Sgt. Anderson.

### b. Sgt. Lucero

Sgt. Lucero testified that he was familiar with the concept of pencil whipping. (P-APP 216–218). Sgt. Lucero denied having any knowledge that his subordinates were engaged in this practice prior to being disciplined in the matter concerning Rodgers. *Id.* Further, there is no summary judgment evidence that Sgt. Lucero was aware that other individuals at the Clements unit engaged in pencil-whipping, despite his knowledge of what the term means. *Id*. Specifically, he testified:

> Q.   Did you ever feel like the officers were hiding the way they did things from their sergeants or their supervisors?
>
> A.   No.

Q.      When did you become aware that cell searches were being documented but
not completed?

A.      After this incident.

*Id*. Sgt. Lucero testified that when he received complaints about time constraints from his correctional officers, he would try to "get down there [to the pod] and help them" conduct the searches himself. *Id*. Sgt. Lucero *did* admit to signing cell search logs without confirming or observing the actual search—but based on the correctional officers' representation. *Id*.

The Court concludes that Patrick has failed to raise a genuine issue of material fact that Sgt. Lucero had a subjective awareness of pencil-whipping at the Clements Unit *prior* to the incident with Rodgers. After all, a supervisor can be familiar with the term for taking short-cuts and forging documentation without the knowledge or belief that such behavior is occurring under his supervision. Hence, Patrick has failed to meet her summary judgment burden on the third part of the *Goodman* test as it pertains to Sgt. Lucero.

### c. Sgt. Jackson

Sgt. Jackson was deposed concerning his actions in supervising the ECB cell block and completing or initialing cell search logs during the months of December 2015 and January 2016. Sgt. Jackson testified that his initials and signature were forged on the cell search logs. (P-APP 889–893). He testified that, with all of his other duties, he simply did not realize he was not signing cell search logs for a long period of time or that such completion of paperwork should have been part of his daily duties. *Id*. This evidence shows that Sgt. Jackson either did not supervise any cell searches on the C-block or ECB block during the months of December 2015 or January 2016 or did not properly complete forms or paperwork concerning any random searches. Although this potentially indicates a failure to properly perform his own job duties and to supervise his subordinates, it does not rise to the level of deliberate indifference. There is no summary judgment

evidence that Sgt. Jackson condoned the behavior of falsifying cell search logs or improperly trained his subordinates in performing such searches. Sgt. Jackson also testified that he never instructed anyone to engage in pencil-whipping or saw evidence of pencil-whipping prior to the incident with Rodgers:

> Q.     Did you come across any of this before being disciplined in connection to this incident?
>
> A.      No.
>
> Q.     On no paperwork you reviewed at any point in time as a sergeant?
>
> A.     No. . . .

(P-APP 897).

However, Patrick argues that Sgt. Jackson's failure to conduct even a single supervisory check on the cell searches raises a genuine issue of material fact. Specifically, she argues that this failure generates the inference that Sgt. Jackson must have known his failure would result in deficient performance by subordinates. Thus, Patrick concludes, Sgt. Jackson had the subjective awareness necessary to show deliberate indifference to Rodgers's safety.

But Patrick's argument does not explain how Sgt. Jackson's failure to conduct random checks on his subordinates' searches proves that he had subjective awareness that this failure led to pencil-whipping. Patrick did not present any summary judgment evidence from correctional officers working under Sgt. Jackson or falsifying such logs that indicate he was aware of pencil-whipping or that he condoned this behavior. Additionally, Sgt. Jackson testified that he conducted daily observation of the inmates housed on his pod assignments and would "attempt to make contact with offenders" in their cells "if they got his attention." (TDCJ-APP 1437).

The Court concludes that Patrick has failed to raise a genuine issue of material fact that Sgt. Jackson had a subjective awareness of pencil-whipping. Hence, Patrick has failed to meet her summary judgment burden on the third part of the *Goodman* test as it pertains to Sgt. Jackson.

### d. Sgt. Mogilnicki

Sgt. Mogilnicki testified that he was familiar with the concept of pencil-whipping in a general sense but that he only became aware that such practices were happening at the Clements Unit after Rodgers was found unresponsive. (P-APP 874, 1006). However, he admitted that a review of some of the cell search logs — which he did not perform until after Rodgers was deceased and the investigation had begun — indicated that such logs were pencil-whipped. *Id.* Sgt. Mogilnicki denied having any knowledge that his subordinates engaged in these practices and denied promoting such practices based on understaffing. *Id*. Sgt. Mogilnicki testified that after Rodgers was found unresponsive and he did a closer review of the cell search logs, he realized that correctional officers were failing to find contraband with too great a frequency to reflect that an actual search was conducted. *Id.* Nevertheless, he did not realize searches were not performed under his supervision prior to Rodgers's death. *Id*.

Most relevant to the Court is Sgt. Mogilnicki's testimony that he knew "some people did it [that is, pencil-whipping], and some people didn't." *Id*. However, Sgt. Mogilnicki also stated that sergeants warned correctional officers against doing it, and he had knowledge of a prior occasion where an individual caught pencil-whipping was disciplined. *Id.* Thus, he did not believe that the behavior was condoned by sergeants or management. *Id*. He discussed his knowledge in the following testimony:

A.      Not necessarily a problem. I mean, you knew that some people did it, and
        some people didn't.

Q.      (BY MS. LANE) And there were warnings from
        sergeants not to do it?

A.      Yes.

Q.      Were there any trainings related to --

A.      I mean --

Q.      -- deterring pencil whipping?

A.      Just trying to train you how to do your stuff properly.

Q.      Do you remember, at any point in your tenure with TDCJ, hearing about
        someone getting disciplined for pencil whipping aside from this incident?

A.      Yes, ma'am.

Q.      And when was that?

A.      I don't know exact dates or years, but people have been caught pencil
        whipping counts or cell searches before and have been disciplinaried [sic]
        for it.

Q.      Would you consider that frequent discipline?

A.      Like it happens often?

Q.      Yes.

A.      No, ma'am.

Q.      How often do you think it's happened that you can remember…?

A.      Maybe once a year, twice a year.

*Id.* It is important to note that Sgt. Mogilnicki believed that management was "correcting" and not

simply ignoring incidents of pencil-whipping behavior on the unit. Further, Officer Taylor stated

that Sgt. Mogilnicki would view the cells of inmates and "nitpick about things wrong with the

cell." (P-APP 991). Although Officer Taylor expressed this as a complaint that caused more work

for him, it still constitutes a level of supervision over the cell searches and correctional officers.

*Id*. Hence, Sgt. Mogilnicki did not merely hope that his own subordinates had refrained from pencil-whipping once he became aware of its occurrence among correctional officers. Rather, he believed that the appropriate response was a disciplinary case against the responsible party.

Patrick does not provide additional summary judgment evidence indicating that Sgt. Mogilnicki failed to adequately respond to any known incident of pencil-whipping. If Sgt. Mogilnicki's supervision of correctional officers when performing cell searches were his only conduct related to Rodgers's death, then Patrick would indeed fail to raise a genuine issue of material fact that Sgt. Mogilnicki had the requisite subjective awareness to meet the third part of the *Goodman* test.

However, the Court must examine a separate interaction that Sgt. Mogilnicki is known to have had with a correctional officer — namely Officer Taylor. In an interview with OIG as part of the investigation, Officer Taylor stated that he did not report an injury he observed on Rodgers's cheek during his shift on January 9–10, 2016. (P-APP 842–843). His supervisor at the time to whom he was supposed to report the injury was Sgt. Mogilnicki. *Id.* Officer Taylor indicated that he was aware of his duty to report any injuries to a supervisor but that his sergeant — Sgt. Mogilnicki — did not respond to reports of threats of fighting in the past. *Id.* In fact, he "never came down there." *Id.* Officer Taylor in fact stated, "I've notified him of the situation and he has not come down there." *Id.* During his deposition concerning his reasons for failing to report Rodgers's injury, Officer Taylor further testified that his sergeant would "just let it [the threat] escalate to a fight" before he did anything. (P-APP 996–1002).

These allegations are supported by evidence that Officer Taylor was the assigned C-wing rover on this date. (TDCJ-APP 1280). This means that he was responsible for any supervision of

cell C-210 and, by extension, for the interactions with inmates on the C block. The evidence also confirms that Sgt. Mogilnicki was on duty as his supervisor. (TDCJ-APP 1279).

There is no evidence in the record cited by Patrick or observed by the Court indicating what occurred in the previous incident mentioned by Officer Taylor, where he claims that Sgt. Mogilnicki ignored his report of a threat of violence concerning other inmates only a month before observing a bruise on Rodgers. Nevertheless, Sgt. Mogilnicki acknowledged that the prisoners on ECB were "close custody" prisoners who had a history of disciplinary problems and were more prone to fighting than prisoners in other cell blocks. (P-APP 869).

By "training" Officer Taylor not to report violence, Sgt. Mogilnicki arguably disregarded Rodgers's safety.[16] Consequently, the Court finds that, *taken in the light most favorable to the plaintiff*, the evidence raises a genuine issue of material fact that Sgt. Mogilnicki acted with deliberate indifference to Rodger's safety. Specifically, Sgt. Mogilnicki "trained" Officer Taylor in a way that ostensibly caused Officer Taylor not to report violence. Hence, Patrick has met her summary judgment burden on the third part of the *Goodman* test as it pertains to Sgt. Mogilnicki.

### e. Sgt. Burkholder

Sgt. Burkholder testified that he was familiar with the concept of pencil-whipping and had heard "rumors" that it occurred on the Clements Unit. (P-APP 316). Sgt. Burkholder indicated that he did not believe and had no reason to suspect that any of his subordinates were failing to complete required safety checks or counts. *Id.* However, Sgt. Burkholder stated that he was told to engage in pencil-whipping when he himself was a correctional officer — even though he refrained from doing it — and that other correctional officers engaged in this behavior. *Id.* Sgt. Burkholder

---

[16] The Court notes that Officer Taylor testified that in this instance in January 2016, he did *not* believe Rodgers and Greggs were about to fight or that Rodgers faced a threat. (TDCJ-APP 1402). Nevertheless, Officer Taylor did indicate that this pattern of response to threats of violence by Sgt. Moglinicki in the past was the reason that Taylor did not report his observations. *Id.*

testified that "you hear, but if you don't see it, then – then it's just hearsay." *Id*. Specifically, Sgt.

Burkholder testified to the following:

> Q.     Okay. So are you aware -- were you, at any point prior to this investigation, aware that that was going on at the Clements Unit?
>
> A.     Aware that people were pencil whipping?
>
> Q.     Yes.
>
> A.     Yes. I would say yes, I was.
>
> Q.     Were you aware that your subordinate officers were pencil whipping?
>
> A.     No.
>
> Q.     But others underneath, different sergeants, were pencil whipping?
>
> A.     You could say that.
>
> Q.     So why did you believe yours weren't, but others were?
>
> A.     I would hope that my -- the COs that worked under us would have enough integrity to do their job correctly.

*Id.* Despite his "hope" that his subordinates were not engaging in pencil-whipping, Sgt. Burkholder

knew that pencil-whipping occurred at the Clements Unit and failed to take specific steps to

counteract this behavior by his subordinates. This is especially clear from his testimony that he

"was not checking" to ensure his subordinates performed their jobs correctly. *Id.* Additionally, his

only explanation for why he believed that his subordinates were not engaged in pencil-whipping

was his hope that they "had enough integrity to do their jobs." *Id*. Unlike Sgt. Mogilnicki, he had

no belief or knowledge that management was correcting the pencil-whipping incidents on the unit.

A mere hope such as this is insufficient to rebut a finding of deliberate indifference. After all, if

Sgt. Burkholder knew correctional officers in the Clements Unit — officers that he knew would,

at one point or another, come under his supervision — were pencil-whipping, then merely hoping they would suddenly stop once under his supervision is equivalent to disregarding their behavior.

The Court concludes that Patrick has raised a genuine issue of material fact that Sgt. Burkholder had a subjective awareness of pencil-whipping. Hence, Patrick has met her summary judgment burden on the third part of the *Goodman* test as it pertains to Sgt. Burkholder.

### 4. The Sergeants Are Not Liable for Deliberate Indifference to Rodgers's Health

The Court now turns to Patrick's claim against the sergeants for deliberate indifference to Rodgers's health. It finds that she has failed to raise a genuine issue of material fact that the sergeants knew of and disregarded Rodgers's medical needs.

As stated in Section I(B)(2), there are two approaches for examining claims for deliberate indifference to health. Regardless of which approach is used, Patrick would need to show that the sergeants acted with deliberate indifference to Rodgers. Specifically, she would need to show that the sergeants knew of and disregarded some serious medical need of Rodgers or a substantial risk of serious harm to his health.

The sergeants correctly point out that there is no evidence in the record showing that they were subjectively aware of any of Rodgers's serious medical needs, let alone that they consciously disregarded them. Examining the allegations and evidence against each Defendant separately as required, there is no evidence that any of the sergeants at any time possessed actual subjective knowledge of Rodgers's physical or mental health conditions or that any of them did anything to consciously disregard a need for care for those conditions. For example, no evidence in the record indicates a subjective awareness of Rodgers's weight loss by correctional officers or sergeants before Rodgers was found unresponsive on January 18, 2016. Indeed, when Sgt. Anderson discovered Rodgers on that date, he immediately sought assistance for him.

Further, there is no evidence that Rodgers had any condition so obvious to the sergeants that it would constitute a serious medical need. To the contrary, nothing in the record indicates that Rodgers had made any complaints about his stomach hurting, his clothes not fitting, or being hungry. The record is also absent of any evidence that Rodgers was suffering from a mental health crisis obvious to anyone who observed him. There is also nothing in the record indicating that he made any efforts to seek medical attention for any issues related to injuries as a result of the assaults. Finally, there is nothing in the record indicating that he, at the time, reported hallucinations, hearing voices, a desire to injure himself or others, or any other medical need.

Patrick argues that the sergeants have not demonstrated that they acted in good faith and attempts to use their disciplinary records to demonstrate their complicity in Rodgers's death. Patrick contends their failure to follow TDCJ policy on the dates preceding Rodgers's death provides evidence that they failed to properly observe Rodgers and failed to render appropriate medical attention. She also argues that Rodgers's mental health condition and past evidence of fighting with cellmates are evidence of deliberate indifference to his needs.

The Court can certainly conclude from the evidence presented that the sergeants seem to have violated TDCJ policy and that they failed to perform their assigned duties in several ways on the dates preceding Rodgers's death. As stated earlier, however, for the purposes of Patrick's claim, the law is clear that the burden is on Patrick to demonstrate that each sergeant acted with *deliberate indifference*. Viewing the evidence in the light most favorable to Patrick, at most she has shown that the sergeants acted with a degree of *negligence* in failing to follow TDCJ policy and properly perform their duties. But negligence is not deliberate indifference.

Further, even under the assumption that the sergeants should have somehow noticed Rodgers's conditions, deliberate indifference requires actual knowledge of the risk to Rodgers's

health. Their failure to alleviate a risk that they should have perceived but did not is insufficient to demonstrate deliberate indifference.

Having established that the sergeants lacked subjective awareness that Rodgers had a serious medical need, the Court also concludes that they lacked subjective awareness of a substantial risk of serious harm to his health. They were aware of no serious medical need posing such a risk, and nothing else in the record indicates that they were aware of any other similar risk.

The Court concludes that sergeants did not act with deliberate indifference to Rodgers's health. Consequently, the Court does not need to consider the objective element under any approach to claims for deliberate indifference to health. To resolve Patrick's claim under any approach, it is sufficient to find that the sergeants did not act with deliberate indifference to Rodgers's health. Hence, Patrick has failed to establish her claim for deliberate indifference to health against the sergeants.

*     *     *

Therefore, the Court finds that Sgts. Anderson, Lucero, and Jackson are entitled to qualified immunity on Patrick's claims of deliberate indifference to Rodgers's safety. Accordingly, their motions for summary judgment on this claim are GRANTED, and this claim against them is DISMISSED with prejudice. The Court finds that Sgts. Mogilnicki and Burkholder are not entitled to qualified immunity on Patrick's claims of deliberate indifference to Rodgers's safety, and their motions for summary judgment on this claim are DENIED. Finally, the Court finds that all of the sergeants are entitled to qualified immunity on Patrick's claim of deliberate indifference to Rodgers's health. Consequently, their motions for summary judgment on this claim are GRANTED, and this claim against them is DISMISSED with prejudice.

65

IV

In this section, the Court examines the summary judgment motion made by Defendant Warden Martin.

### A. Deliberate Indifference and Failure to Train and Supervise

Warden Martin moves for summary judgment on Patrick's claims for deliberate indifference against him in his official capacity. Warden Martin makes three arguments for this motion. First, he argues that he is entitled to Eleventh Amendment immunity in his official capacity. Second and relatedly, he argues that he is not a person under 42 U.S.C. § 1983 in his official capacity. Third, he argues that Patrick is not entitled to declaratory relief because the declaration requested is not prospective in nature and because there is not an "ongoing" violation of constitutional rights by Warden Martin in his official capacity. The Court considers these three arguments in order, grouping the first and second arguments together.

### 1. Entitlement to Eleventh Amendment Immunity in Official Capacity Cases

Section 1983 does not allow a plaintiff to seek a remedy against a state for alleged deprivations of civil liberties since "[t]he Eleventh Amendment bars such suits unless the State has waived its immunity." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) (citing *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472–73 (1987)). As such, states, officials of the state acting in their official capacities, and government entities that are considered "arms of the State" are not "persons" under Section 1983. *Will*, 491 U.S. at 70–71. Thus, they cannot be sued in federal court for violations under Section 1983 without the state's express consent via waiver of sovereign immunity. *Id*. at 67. In deciding whether a state has waived sovereign immunity, courts can find waiver "only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable

construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)). Thus, this Court now looks to state law to determine if Texas has waived sovereign immunity for Section 1983 claims.

In Texas, it is well established that "sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State." *Fed. Sign v. Texas S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). The Fifth Circuit has accordingly "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

Here, Warden Martin is correct that he is entitled to immunity under the Eleventh Amendment to the extent that Patrick has sued him in his official capacity for monetary damages.[17] As such, to the extent Patrick requests such damages, her claim against Martin is barred. However, in her response to Martin's summary judgment motion, Patrick clearly requests only "declaratory relief" against Warden Martin in his official capacity for violations of the Eighth Amendment. (ECF No. 361-4 at 8). Although declaratory relief is not specifically sought by the complaint, the Court finds Patrick's request is appropriately considered by her seeking "such other and further relief." *Id*. at ¶ 2. Patrick further argues that as such she is entitled to pursue her claims under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908).

The Supreme Court has recognized that certain types of relief may be pursued against state actors in their official capacities absent a request for monetary damages. Such relief includes declaratory and injunctive relief. Both parties appeal to *Verizon Maryland, Inc. v. Public Serv. Com'n of Maryland*, 535 U.S. 635 (2002) to support this proposition. However, they do not agree

---

[17] Patrick makes clear that Warden Martin "is sued in his official capacity under Section 1983. He is not sued in his individual capacity under Section 1983." (ECF No. 361-4 at 7).

on how the case applies to the issue — that is, on whether declaratory relief is appropriate. The Court finds Warden Martin's interpretation of the case to be correct for the reasons that follow.

### 2. *Declaratory Relief*

The Supreme Court has clearly stated that to pursue claims against a state, or state actors in their official capacities, the relief sought must be prospective and the violation alleged must be ongoing. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996) ("[W]e often have found federal jurisdiction over a suit against a state official when that suit seeks *only prospective* injunctive relief in order to 'end a *continuing violation* of federal law.'" (emphasis added) (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)). Consequently, where monetary relief is not available, declaratory relief is, for the most part, only available where injunctive relief would also be available — in situations where it is necessary to address prospective harm.

Accordingly, injunctive relief and declaratory relief will likely be barred in cases involving the death of an inmate unless such relief is necessary to address prospective violations of rights by the defendant. "Remedies designed to end a *continuing* violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green*, 474 U.S. at 68 (emphasis added) (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984); *Milliken v. Bradley*, 433 U.S. 267 (1977)). The Supreme Court in *Green* also discussed the propriety of declaratory relief by focusing on the "continuing violation" as opposed to a dispute about "past actions," indicating that only relief designed to prevent future violations is appropriate. *See Green*, 474 U.S. at 72–73 (holding that a declaratory judgment is not available when the result would be a partial "end run" around the decision in *Edelman v. Jordan*, 415 U.S. 651 (1974), which prohibits such relief to punish past actions).

68

Here, Patrick has not alleged facts nor presented any summary judgment evidence to establish an ongoing violation by the State of Texas or Warden Martin warranting declaratory relief as recognized by *Ex Parte Young*. To the extent Patrick is seeking prison reform for other inmates, it is clear that she "lack[s] standing to assert claims for injunctive or declaratory relief." *See Walker v. Livingston*, No. 09–20508, 381 Fed. Appx. 477, 478–79 (5th Cir. 2010) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Further, she has neither alleged facts nor presented any summary judgment evidence to establish that the Court can consider or award the declaratory relief she seeks: that "Defendant Martin, in his official capacity, violated Alton Rodgers's Eight [sic] Amendment right to be free of cruel and unusual punishment through deliberate indifference to his medical and security needs." (ECF No. 361-4 at 8). In fact, such a declaration as to past conduct is precisely the sort of "end run" around the Supreme Court's decisions in *Green* and *Edelman* that has been rejected.

Patrick's briefing — including both the Response to Warden Martin's Motion for Summary Judgment and the corresponding Sur-Reply — provides no support for the ongoing and prospective nature of the alleged constitutional violations by Warden Martin in his official capacity. *See* (ECF Nos. 361-4 and 428-1). Instead, Patrick merely claims that her request for declaratory relief falls outside of Eleventh Amendment immunity given the reasoning of the Supreme Court in *Verizon Maryland*. This Court notes the specific language in *Verizon Maryland* relied upon by Patrick, though not specifically cited by her:

> As for Verizon's prayer for declaratory relief, even though Verizon seeks a declaration of the past, as well as the future, ineffectiveness of the Commission's action, so that the private parties' past financial liability may be affected, no past liability of the State, or of any of its commissioners, is at issue.

*Verizon Maryland, Inc.*, 535 U.S. at 636 (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)). Unlike *Verizon Maryland*, the claims at issue here involve the past liability of the State. Thus, the

language quoted above cannot support an inference that her request for declaratory relief is not subject to the restrictions of Eleventh Amendment immunity.

The Court therefore finds that Patrick's claims for declaratory relief are subject to dismissal with prejudice on these grounds.

### B.  Access-To-The-Courts

Warden Martin also moves for summary judgment on Patrick's access-to-the-courts claim against him in his individual capacity. Warden Martin makes two arguments for this motion. First, Patrick's access-to-the-courts claim fails because there is no evidence that he violated Rodgers's constitutional right of access-to-the-courts, which means that he is entitled to qualified immunity. Second, Patrick's right of access-to-the-courts claim was not clearly established in January 2016, which also means that Warden Martin is entitled to qualified immunity. The Court considers these two arguments using the two-part qualified immunity test outlined in Section I(A) of this Memorandum Opinion.

#### 1.  Evidence of Warden Martin's Involvement in any Destruction of Evidence

Patrick argues that Warden Martin violated Rodgers's right of access-to-the-courts through his involvement in the destruction of evidence that interfered with the ability to file or pursue a claim. Specifically, she alleges that Warden Martin ordered Rodgers's cell to be cleaned prior to inspection by the OIG, had some level of involvement in the destruction of video evidence on the ECB pod during the ongoing investigation, and failed to preserve the mattress from Rodgers's cell during the investigation. Patrick's allegations are supported only by the testimony from SSI Hefner in the summary judgment evidence.

The Court rejects Patrick's argument and finds that she has not raised a genuine issue of material fact that Warden Martin was involved in the destruction of evidence as alleged.

Specifically, the Court finds Hefner's testimony to be unreliable and unsupported by the objective summary judgment evidence for the reasons discussed below.

### 2. OIG's Arrival and Inspection on January 18, 2016 and the Serious Incident Review by TDCJ at Huntsville

After seeing Rodgers unresponsive in his cell on January 18, 2016, Sgt. Anderson secured Rodgers's cellmate Greggs and summoned assistance for Rodgers. (TDCJ-APP 764). At 7:23 a.m., the cell door to C-210 opened. (P-APP 713). The cell was secured by correctional officers, and only TDCJ staff entered the cell to provide assistance to Rodgers and transport him for medical care that morning. The cell remained closed and was observed by one or more of CO3 Padilla, CO3 Chapman, and Sgt. Anderson from 7:42 a.m. until the arrival of OIG at 9:14 a.m. (P-APP 713, TDCJ-APP 770, TDCJ-APP 34). OIG Kendall documented the evidence observed during his investigation that morning, taking photographs of the evidence and the cell. (TDCJ-APP 770).

As outlined in the facts of this case, the cell door was opened several times in the coming days. However, Patrick's allegation regarding the loss of potential evidence stems from alleged tampering with items prior to OIG Kendall's arrival at 9:14 a.m.

### 3. Timeline: SSI Jason Hefner's Credibility and the Objective Evidence

Patrick acknowledges in her Sur-Reply to Warden Martin's Motion for Summary Judgment that "the photographs OIG took of Alton's cell that morning, sometime after 9:14 a.m. (according to OIG Investigator Kendall's account), are *entirely inconsistent* with Jason Hefner's observations of the cell." (ECF No. 428-1 at 8) (emphasis added). The Court agrees. However, the Court disagrees that this bolsters SSI Hefner's account of the cell's cleaning on January 18.

SSI Hefner provided an initial affidavit in support of his recollections of cleaning the cell, which contained the following excerpts:

On the day Alton Rodgers was taken from the ECB unit, January 18, 2016, I was assigned as usual to work in ECB . . . . That morning when we got to ECB it was obvious that there was some kind of big thing going on. It was a rushed day. From the moment that the officer came to get us, we were rushed. When we got there, we knew something had gone wrong.

Warden Martin, Warden Nash, a female Captain, and *maybe 2 or 3 OIG officers were already there*. They were saying that *Huntsville was on the way*. I heard them saying that Huntsville was going to be there at 8 am. I saw a **camera set up on a tripod** . . . .
**There was an OIG officer sitting on other side of the desk from another officer. One of the OIG officers is Fernandez (he was formerly a Potter County Sheriff).**

They were interviewing an officer in the multi-purpose office when I first got there, but I am not sure which officer…

Warden Martin was red in the face, and he was stomping around and cursing. All of the officers were on edge and nervous…

I heard Warden Martin give Lt. Thompson a direct order to get someone to clean that cell.

Lt. Thompson then gave me the direct order to clean the cell…

I noticed the cell door was secured open. The first thing I saw was the trash. Styrofoam cups were on table and shelf. Food was on the floor. The stainless steel wall where the toilet and sink and shower were was stained with what appeared to be urine, and there was stuff in the toilet (feces, waste) and the toilet seat was covered in filth. I could not tell what it was, but it was coated in filth. There were pieces of paper—bits and pieces of paper—scattered around the cell. I noticed a large circle stain on the floor around the drain with slimy residue, where water must have been left standing. *It appeared to me that the backed up drainage had just been fixed.*

Normally there are two mattresses in a cell. In this cell the **top bunk mattress was present** but the bottom bunk mattress was not. The steel frame bunk has a two-inch lip to keep mattresses from slipping off, and there was some kind of dried fluid on the steel part of the frame on the **bottom bunk where the mattress would go but the mattress was not there**…

(P-APP 902–903) (emphasis added).

First, the Court notes the inconsistencies not only *between* SSI Hefner's affidavit and his deposition testimony, but also between the affidavit and all of the objective evidence in this case.[18] The inconsistencies immediately apparent to the Court are:

- Rodgers's bed was the top bunk, but SSI Hefner stated that the bottom bunk mattress was missing and had suspicious material. (TDCJ-APP 412, 415).

- No OIG personnel were on the scene the day of the incident until after 9:00 a.m. (TDCJ-APP 34). SSI Hefner knew one of the OIG inspectors by name and claimed that OIG was already conducting interviews when he arrived. This contradicts the entire OIG investigative report.

- SSI Hefner stated that the backup drainage had apparently just been fixed in the cell he cleaned but also stated in his deposition testimony that it would take a very long time to arrange plumbing to be fixed in ECB cells. Furthermore, the extremely narrow window between the time that Rodgers was extracted and the time that SSI Hefner claimed that he cleaned the cell would not allow for such a fix.

- SSI Hefner claimed that he heard people saying "Huntsville" would arrive by 8:00 a.m. on the morning he cleaned the cell. This hearsay evidence is not consistent with the timeline of events on January 18. After discovering Rodgers unresponsive at 7:20 a.m., Duty Warden Darrell Nash was notified at 7:30 a.m, OIG Investigator Tim Burge was notified at approximately 7:35 a.m., Warden Barry Martin was notified at 8:30 a.m., Ginger Thompson with EAC was notified at 10:20 a.m. (TDCJ-APP 140). OIG Investigator Burge notified OIG Kendall after his notification. The Court is not persuaded by Patrick's argument that SSI Hefner and TDCJ personnel confused OIG and Huntsville. This is because OIG was clearly already on the scene the day he cleaned the cell, according to his own statements and familiarity with those individuals. If "Huntsville" was set to arrive at 8:00 a.m. on the day Hefner cleaned the cell, then a serious inconsistency arises: Warden Martin had not yet been notified, OIG had not yet arrived on the scene, and Huntsville was not even notified by that time on January 18. It appears from all evidence that Huntsville arrived to conduct the Serious Incident Review on January 22 and not before. The Court also takes judicial notice that the distance between Huntsville and the Clements Unit is approximately 530 miles, or over nine hours of driving time.

---

[18] Such inconsistencies remain even excluding Warden Martin's testimony that he was not present at the scene on the morning of January 18 until after OIG had arrived and photographed the scene.

- SSI Hefner admitted in deposition testimony that he was uncertain which day he cleaned the cell and was not sure it was the day Rodgers was extracted from the cell. (P-APP 916).

- SSI Hefner's account of cleaning the cell on January 18 contradicts the timeline above indicated by Sgt. Anderson, CO3 Padilla and CO3 Chapman. These individuals took possession of the cell immediately following Rodgers's extraction.

- Patrick is correct that if SSI Hefner did not clean the cell the morning of January 18, his entire account of the state of the cell is unreliable due to the photographs taken by OIG on January 18 between 9:15 a.m. and 9:30 a.m.

- During his deposition testimony, SSI Hefner indicated that no commissary items or personal items of the inmate were in the cell when he cleaned it. (P-APP 920). However, the pictures taken by OIG Kendall show commissary and personal items of the inmates in the cell. (TDCJ-APP 271–275). This contradicts not only SSI Hefner's testimony regarding the date that he cleaned the cell, but also his testimony regarding the state of the cell when he cleaned it.

The Court has viewed the time-stamped and dated photographs taken by OIG Kendall on January 18, 2016 between 9:15 and 9:30 a.m. (TDCJ-APP 271–275). The photographs show at least some amount of bedding on each bunk, personal items and commissary items neatly arranged, no filth in the sink or shower area, no filth on the toilet, no evidence of standing water, and no evidence of blood or bodily fluids readily apparent. *Id*. Thus, the Court finds that SSI Hefner's account of the condition of the cell is not consistent with the objective evidence before the Court. The Court thus discounts SSI Hefner's testimony. Moreover, because no reasonable jury could accept SSI Hefner's account, the Court also finds that his testimony does not raise a genuine issue of material fact.

### 4. Timeline: Notification of Warden Martin on January 18, 2016

Patrick argues that on the morning of January 18, Warden Martin was present on the unit prior to 7:42 a.m., when the cell door was closed after Rodgers was extracted from his cell. Patrick relies on the statements of SSI Hefner to establish that Warden Martin was present at the unit

earlier than the time that he testified to. For the reasons discussed in Section IV(B)(3), the Court finds that SSI Hefner's testimony regarding the date that he cleaned the cell and observed Warden Martin at the unit is not consistent with objective evidence. Consequently, it further finds that no reasonable jury could find that he observed Warden Martin on the morning of January 18. Patrick has not presented any other summary judgment evidence that Warden Martin was present during the 20-minute time frame that Rodgers's cell door was open during the extraction or even prior to the arrival of OIG. Furthermore, Duty Warden Nash's indication of the time that he notified Warden Martin corresponds with Warden Martin's testimony. Warden Martin testified that he was not present at the Clements Unit when he received the phone call from Duty Warden Nash on the morning of January 18. Warden Martin estimated he arrived at the Clements Unit at around 10:00 a.m. that morning.

Hence, there is no sufficient summary judgment evidence that Warden Martin was present at the scene when Rodgers was extracted from his cell prior to the arrival of OIG at 9:14 a.m. This means that Patrick has failed to raise a genuine issue of material fact that Warden Martin violated Rodgers's right of access-to-the-courts through the destruction of evidence.

As stated in Section I(A), there is a two-part test for overcoming qualified immunity. Since Patrick has failed to show that a violation of a federal right has occurred, the first part of that test has not been met. Thus, the Court does not need to examine the second part of the test — the question of whether the right was clearly established at the time of the alleged violation. Consequently, the Court does not need to examine Warden Martin's second argument regarding Patrick's access-to-the-courts claim. Instead, the Court concludes that Warden Martin did not violate any federal rights of Rodgers, which suffices to determine whether Warden Martin is entitled to qualified immunity.

*       *       *

Therefore, this Court finds that Warden Martin is entitled to Eleventh Amendment immunity on Patrick's claim for deliberate indifference to Rodgers's safety and health and qualified immunity on her access-to-the-courts claim. Consequently, Warden Martin's motion for summary judgment on both claims is GRANTED, and Patrick's claim against Warden Martin for deliberate indifference under the Eighth Amendment is DISMISSED with prejudice.

## V

In this section, the Court examines the summary judgment motion made by Defendant TDCJ. Specifically, TDCJ moves for summary judgment on Patrick's ADA and RA claims against it. TDCJ makes two arguments for this motion. First, it argues that Patrick's ADA claim fails because there is no evidence that TDCJ intentionally discriminated against Rodgers by failing to accommodate him. Second, it argues that Patrick's RA claim fails for the same reasons. The Court grants TDCJ's motion for summary judgment for the reasons that follow.

### A. Title II of the ADA and Section 504 of the RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Windham v. Harris Cty., Texas*, 875 F.3d 229, 234 (5th Cir. 2017) (alteration in original) (quoting 42 U.S.C. § 12132). Similarly, "Section 504 of the [RA] provides that '[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]'" *Doe v. Columbia-*

*Brazoria Indep. Sch. Dist. by & through Bd. of Trs.*, 855 F.3d 681, 690 (5th Cir. 2017) (alterations

in original) (quoting 29 U.S.C. § 794(a)).

With regard to public entities, Congress intended that Title II "work in the same manner as

Section 504," and jurisprudence interpreting either statute is generally applicable to both. *Hainze*

*v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (citations omitted).

> To make out a prima facie case under Title II, a plaintiff must show "(1) that he is
> a qualified individual within the meaning of the ADA; (2) that he is being excluded
> from participation in, or being denied benefits of, services, programs, or activities
> for which the public entity is responsible, or is otherwise being discriminated
> against by the public entity; and (3) that such exclusion, denial of benefits, or
> discrimination is by reason of his disability."

*Windham*, 875 F.3d at 235 (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72

(5th Cir. 2004)). Likewise:

> [t]he prima facie case of discrimination under the [RA] is operationally identical to
> the test under the ADA, requiring a plaintiff to allege: (1) the existence of a program
> or activity within the state which receives federal financial assistance; (2) the
> plaintiff is an intended beneficiary of the federal assistance; and (3) the plaintiff is
> a qualified handicapped person, who solely by the reason of her handicap has been
> excluded from participation in, been denied benefits from, or otherwise has been
> subject to discrimination under such program or activity.

*Melton*, 391 F.3d at 676 n.8 (emphasis omitted).[19] Because the legal standards and the

jurisprudence of the ADA and RA are effectively the same, this Court's analysis of the ADA

should be assumed to extend to the RA unless otherwise stated.

---

[19] Title II of the ADA and Section 504 of the RA differ on the third element of a *prima facie* case of disability discrimination — causation. *See Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) ("The only material difference between [Title II and Section 504] lies in their respective causation requirements."). The proper causation standard under the RA is "whether the discrimination took place 'solely because of' the disability." *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002); *see* 29 U.S.C. § 794(a). In contrast, "the ADA does not require 'sole causation.' The proper causation standard under the ADA is a 'motivating factor' test." *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008); *see* 42 U.S.C. § 12132. Under the "motivating factor" test, discrimination "must actually play a role in the [public entity's] decision making process and have a determinative influence on the outcome." *Pinkerton*, 529 F.3d at 519 (quoting *Soledad*, 304 F.3d at 503–04). Because Patrick fails to satisfy the less stringent "motivating factor" requirement, she necessarily fails the more stringent "sole factor" ADA requirement — in addition to the other reasons her ADA claim fails. *See infra* Section V(B).

As stated above, the second element of a *prima facie* case under the ADA is being excluded from participation in or denied the benefits of programs provided by the public entity (or otherwise being discriminated against by the entity). "State prisons fall squarely within the [ADA] definition of 'public entity,' which includes 'any department, agency, . . . or other instrumentality of a State or States or local government.'" *Yeskey*, 524 U.S. at 210 (quoting 42 U.S.C. § 12131(1)(B)). Indeed, the fundamental "program" or benefit offered by prisons includes adequate medical care. *See United States v. Georgia*, 546 U.S. 151, 157 (2006).

The third element of a *prima facie* case under the ADA is that the exclusion by, denial of benefits from, or discrimination by the public entity in question is by reason of the plaintiff's disability. A plaintiff can satisfy this element by advancing a theory of "failure to accommodate." *See Windham*, 875 F.3d at 235 (noting that the plaintiff's attempt to satisfy the third element of claim under Title II of the ADA was a theory of failure to accommodate). To succeed on a failure-to-accommodate theory, a plaintiff must "prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the [public] entity; and (3) the entity failed to make reasonable accommodations [for that disability]." *Id.* at 236 n.8 (quoting *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)). "Mere knowledge of the disability is not enough" to show that the covered entity knew of the disability and its consequential limitations. *Id.* at 236. The plaintiff must "specifically identify the disability *and resulting limitations* and request an accommodation in 'direct and specific' terms." *Id.* at 237 (emphasis added) (citations omitted).

If the plaintiff does not request a reasonable accommodation, "he can prevail *only* by showing that 'the disability, resulting limitation, *and* necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* (emphasis added) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)). More specifically, the "open,

obvious, and apparent" standard requires the plaintiff to show that the entity's agents "knew or should have known" of the plaintiff's disability, resulting limitation, and necessary reasonable accommodation. *Id.* at 237–238 (suggesting that evidence that the defendant's agents knew or should have known of the plaintiff's disability, resulting limitation, and necessary reasonable accommodation would have satisfied the "open, obvious, and apparent" standard). The "open, obvious, and apparent" standard is a "narrow exception" to "the generally applicable rule that '[i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one.'" *Id.* at 239 (alterations in original) (quoting *Taylor*, 93 F.3d at 165).[20] Well-understood and outwardly visible disabilities such as blindness, deafness, or being wheelchair-bound are cases where the disability, resulting limitation, and reasonable accommodation are open, obvious, and apparent. *See Windham*, 875 F.3d at 238 (stating that "well-understood and outwardly visible disabilities like, say, blindness, deafness, or being wheelchair-bound" "would . . . have been 'open, obvious, and apparent' even if [the plaintiff] had never attempted to explain them").

### B. TDCJ Did Not Fail to Reasonably Accommodate Rodgers's Disability

Patrick argues that TDCJ violated Title II of the ADA and Section 504 of the RA by failing to provide him reasonable accommodations for his known physical and mental disabilities. Specifically, she claims that TDCJ intentionally discriminated against Rodgers by failing to accommodate his known mental disability with a special housing assignment or a closely

---

[20] The Fifth Circuit has not yet decided whether an agent's requisite knowledge is viewed from an objective or subjective perspective. *See Windham*, 875 F.3d at 237 ("The parties dispute what type of knowledge is required . . . . Although our caselaw speaks generally in terms of the entity's subjective knowledge, we do not appear to have confronted [the question of what type of knowledge is required]. Nor must we do so now." (footnotes omitted)).

monitored shared cell and his known physical disabilities with medical treatment. *See, e.g.*, (ECF No. 282) at ¶¶ 37, 90, 93–95.

In analyzing Patrick's claims, the Court will assume for the sake of argument that Patrick has established a genuine issue of material fact as to the first element of an ADA claim: that Rodgers had a disability that made him a qualified individual under the ADA. Even then, the Court still rejects Patrick's argument because she has not shown that TDCJ failed to provide reasonable accommodations for Rodgers's disability. More precisely, the Court finds that Patrick has failed to raise a genuine issue of material fact that the accommodations she describes were open, obvious, and apparent needs based on the limitations of Rodgers's disabilities.

Patrick has not argued that Rodgers requested and was denied any accommodation. Rather, she argues that Rodgers's disability was open, obvious, and apparent and that the accommodations she articulates were therefore required. However, as stated earlier, Patrick must also show not only that the disability was open, obvious, and apparent, but also that the resulting limitation of the disability and accommodation were as well. To show that the disability, resulting limitation, and accommodation were open, obvious, and apparent, Patrick must show that they were known or should have been known by TDCJ employees. The Court examines these first as they pertain Rodgers' mental disabilities and then as they pertain to his physical ones.

### 1. *The Limitations of and Accommodations for Rodgers's Mental Disabilities Were Not Open, Obvious, and Apparent*

Regarding Rodgers's mental disabilities, TDCJ employees on the Clements Unit Classification Committee ("UCC") had some knowledge that Rodgers suffered from mental health

issues when determining his housing assignments at the Clements Unit.[21, 22] For example, the record before the Court indicates that Rodgers was treated at the Skyview Unit — a TDCJ Inpatient Psychiatric Unit — in 2011 and 2012. *See* (P-APP 45–54, 59–92). During his time at Skyview, Rodgers was diagnosed with varying forms of psychosis and mental health illness and treated with different antipsychotic medications. His diagnosis and treatment history are reflected in his TDCJ Health Summary for Classification Form, dated October 13, 2015. The Form indicates that he had a "PULHES" classification of "S3NR" and certain medical restrictions. (P-APP 200).[23] According to Frank AuBuchon, Patrick's correctional practices expert and the former Administrator for Classification Operations at the TDCJ Classification and Records Headquarters:

> This PULHES classification is an indication that offender Rodgers has a significant mental health issue. Further, the form shows that Rodgers has a restriction that he must be housed on a facility that has extended medical department hours and a restriction that a member of the Mental Health Department must be consulted before taking disciplinary action against the offender.

(P-APP 205).

When viewed in the light most favorable to Patrick, the evidence indicates that agents on the UCC were aware of the Skyview treatment records, the TDCJ Health Summary for

---

[21] The three-person UCC is responsible for assigning inmates to their housing. *See* (P-APP 231); *see also* (TDCJ-APP 451-456) (containing various UCC History Forms for Rodgers). Housing assignments, among other things, are generally made by the UCC in light of an inmate's medical history and Health Summary for Classification Form. *See* (P-APP 231). Rodgers's most recent Health Summary for Classification Form was prepared by Dr. Ofomata, an agent of TTUHSC, on October 13, 2015. *See* (P-APP 200). It is unclear from the record how much of an inmate's medical history is considered by the UCC for housing assignment purposes or which individuals from the Clements Unit comprise the UCC.

[22] Rodgers was reassigned from another unit to the Clements Unit on October 28, 2014. *See* (TDCJ-APP 1462). A UCC History Form for Rodgers dated on October 29, 2014, conspicuously contains the handwritten notation "*psych." *See* (TDCJ-APP 456). When viewed in the light most favorable to Patrick, this evidence indicates that the UCC had that form *before* it reassigned Rodgers to be housed with Greggs in November 2015. *See* (TDCJ-APP 452).

[23] "TDCJ inmates are classified for housing and work using the PULHES system." *Flowers v. Isbelle*, No. CIV.A. H-12-1165, 2012 WL 6099046, at *1 n.1 (S.D. Tex. Dec. 7, 2012). "The military services established the 'PULHES' numeric system for rating a patient's physical health by assigning a number from one to four in the following categories: Physical capacity or stamina, Upper extremities, Lower extremities, Hearing—ears, Eyes, and psychiatric." *Id.* (citing *Gossage v. United States*, 91 Fed. Cl. 101, 103 n.3 (Fed. Cl. 2010)).

Classification Form dated October 13, 2015, or some other records pertaining to Rodgers's serious mental health history. Because TDCJ employees knew of Rodgers's disability, this Court finds that his disability was open, obvious, and apparent to TDCJ.

Despite potential knowledge of Rodgers's disability, however, Patrick has not shown that the resulting limitations of the disability or the need for the accommodation articulated by Patrick were open, obvious, and apparent to TDCJ. In particular, there also is no evidence that Rodgers requested an accommodation in direct and specific terms from TDCJ, during the relevant time of November 2015 to January 2016. There is no evidence that the consequential limitations and necessary reasonable accommodations stemming from Rodgers's mental disability were known or should have been known to any TDCJ employee. Although Patrick argues that TDCJ should have accommodated Rodgers's known mental disability with a special housing assignment or a closely monitored shared cell, she fails to establish a genuine issue of material fact that TDCJ or TDCJ employees knew or should have known that the limitations resulting from Rodgers's disability required him to be single-celled or monitored more closely than other inmates.

Patrick's final argument to be considered here cites statements by her correctional medicine expert Dr. Homer Venters and her correctional practices expert Mr. AuBuchon. Dr. Venters opined that Rodgers should have been single-celled because "persons with psychotic disorders particularly, even when they are faring well, can experience high levels of paranoia, agitation that may not be noticeable to clinical staff or that may not be reported to clinical staff." (P-APP 180). Similarly, Mr. AuBuchon opined that "TDCJ and its employees should have, if nothing else, provided enhanced monitoring of Rodgers given his mental health status." (P-APP 205).

However, these opinions are simply conclusory. As such, they do not raise a genuine issue of material fact issue as to whether it was open, obvious, and apparent to any TDCJ employee that

any limitations resulting from Rodgers's mental disability reasonably necessitated such accommodations. The Court therefore concludes that the limitations of Rodgers's disabilities and the accommodations for them that Patrick articulates were not open, obvious, and apparent.

### 2. The Limitations of and Accommodations for Rodgers's Physical Disabilities Were Not Open, Obvious, and Apparent

As for Rodgers's physical disabilities, Patrick argues that Rodgers was physically disabled both because of assaults by his cellmate Greggs and because of weight loss that he experienced while housed with Greggs.

Regarding Rodgers's injuries, the Court notes that the summary judgment evidence does not clearly identify *specifically* when Rodgers sustained any bone fractures, abrasions, or the brain bleed discovered during his autopsy. This makes it difficult for Patrick to show that any TDCJ employee who interacted with Rodgers knew or should have known about his injuries since it is unclear whether he had them at the time of the interaction. For Patrick to meet her burden, she must identify an injury that clearly existed at the time of an interaction with a TDCJ employee.

To that end, Patrick makes two arguments. First, she argues that there is evidence that a TDCJ employee — Officer Taylor — observed a bruise on Rodgers's check on January 10, 2016, and failed to report such injury to a supervisor. Second, she argues that there is evidence that another TDCJ employee — Officer Randal — interacted with Rodgers a week prior to his death. Patrick further argues that these interactions are sufficient to show that TDCJ employees were aware that the assaults had occurred.

Here, however, Patrick seems to have conflated the standards for a deliberate indifference claim with the standards for a claim under the ADA or the RA. As stated earlier, to meet the open, obvious, and apparent standard, Patrick must show that a TDCJ employee knew or should have known about these disabilities, the resulting limitations of these disabilities, *and* the reasonable

accommodations for these disabilities. Without showing all three of these things, Patrick cannot meet her burden of showing that Rodgers's physical disabilities were open, obvious, and apparent.

For Officer Taylor, although he observed a single bruise on Rodgers's cheek, there is no evidence that he knew or should have known that the bruise indicated a disability. And there is certainly no evidence that he knew or should have known that this disability had resulting limitations or that a reasonable accommodation for it was needed. At very best, his observation was an indication that Rodgers's safety might have been at risk.

The absence of evidence is even more glaring with respect to Officer Randal. There is no evidence that Officer Randal knew or should have known of Rodgers's injuries (or even his weight loss) during these interactions. And even if he did, there is no evidence that he knew or should have known of the resulting limitations of those injuries or that reasonable accommodations were needed for them.

The foregoing analysis also applies to Rodgers's weight loss. Patrick argues that the failure of TDCJ correctional officers to properly conduct randomized cell searches and bed checks led or contributed to their failure to notice his weight loss. Additionally, she argues that the failure of TDCJ sergeants to properly supervise these officers also contributed to this failure. But even assuming that she is correct about all of this, she has failed to provide any evidence that these officers and sergeants knew or should have known about Rodgers's weight loss, the resulting limitations of it, *and* the reasonable accommodations for it. Again, all three of these must be established to show that they were open, obvious, and apparent. Patrick has failed to establish these with respect to both Rodgers's injuries and his weight loss and thus has failed to meet her burden for her ADA and RA claims.

\*   \*   \*

The Court therefore GRANTS TDCJ's motion for summary judgment, and Patrick's ADA and RA claims against TDCJ are DISMISSED with prejudice. Before concluding this section, the Court notes that Patrick had previously filed an unopposed motion for the dismissal of her access-to-the-courts claim against TDCJ under Federal Rule of Civil Procedure 41(a)(2). (ECF No. 381). However, the Court at the time denied that motion because the rule in question applied only to the dismissal of an entire action, not particular claims. *See* (ECF No. 388). Considering the matter now, the Court concludes that the same Eleventh Amendment immunity analysis from Section IV(A)(1) applies to Patrick's access-to-the-courts claim against TDCJ. Specifically, to the extent that Patrick sought monetary damages from TDCJ under Section 1983, her claim is barred on the grounds that TDCJ is a Texas agency that enjoys Eleventh Amendment immunity from this kind of lawsuit. Accordingly, the Court also DISMISSES Patrick's access-to-the-courts claim against TDCJ with prejudice.

## VI

TTUHSC moves for summary judgment on Patrick's ADA and RA claims against it. TTUHSC makes, *inter alia*, two arguments. First, TTUHSC argues that Patrick's ADA claim fails because there is no evidence that TTUHSC intentionally discriminated against Rodgers by failing to provide reasonable accommodations for him. Second, TTUHSC argues that Patrick's RA claim fails for the same reasons. For the reasons that follow, the Court grants TTUHSC's motion for summary judgment.

\*   \*   \*

Patrick claims that TTUHSC violated Title II of the ADA and Section 504 of the RA by failing to accommodate his known mental and physical disabilities. Specifically, Patrick claims

that TTUHSC failed to accommodate, first, his known mental disability with required medical treatment and medication, a referral for appropriate medical treatment, adequate monitoring after changing his medication, or an appropriate housing assignment from TDCJ and, second, his known physical disabilities with required medical treatment. *See, e.g.*, (ECF No. 282 at ¶¶ 92, 94–95).

TTUHSC makes several arguments in response to Patrick's claims. However, the Court will address only one of them since it, if correct, is sufficient to justify the Court's decision to grant TTUHSC's motion for summary judgment. As stated in Section V(A), to establish a prima facie case under Title II of the ADA and Section 504 of the RA, a plaintiff must show that he has a disability that qualifies him under these acts, that he was excluded in participation from benefits by, denied benefits by, or subject to discrimination by a public entity, and that the entity did this because of his disability. The plaintiff can demonstrate the last of these three elements by showing that the entity in question failed to provide a reasonable accommodation for him. If, however, the plaintiff does not request a reasonable accommodation, he can prevail only by showing that the disability, its resulting limitation, and the reasonable accommodation all were open, obvious, and apparent to the entity. This is accomplished by showing that the entity knew or should have known about the disability, its resulting limitation, and the reasonable accommodation.

Claims under the ADA and the RA also should be distinguished from claims of insufficient medical care. *See Cadena v. El Paso County*, 946 F.3d 717, 726 (5th Cir. 2020). ("The ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" (quoting *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012)); *see also Lee v. Valdez*, No. 3:07-CV-1298-D, 2009 WL 1406244, at *13 (N.D. Tex. May 20, 2009) ("'Inadequate medical care,' however, 'does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability.'" (internal quotation marks and citations omitted)).

Here, the Court assumes for the sake of argument that Patrick has raised a genuine issue of material fact as to the first and second elements: that Rodgers has a disability that qualifies him under the ADA and the RA and that he was excluded from participation in benefits by, denied benefits by, or subject to discrimination by TTUHSC. Thus, to meet her summary judgment burden, Patrick only needs to raise a genuine issue of material fact as to the third element: that Rodgers was subject to these things by TTUHSC by reason of his disability. However, Patrick has not argued that Rodgers requested and was denied any accommodation. Consequently, she must show that his disability, the resulting limitation of his disability and the accommodations that she articulates for it were necessary were open, obvious, and apparent. And to show *that*, she must show that they were known or should have been known by TTUHSC employees.

For the reasons that follow, the Court finds that she has failed to show this. The Court explains these reasons as they relate to the three TTUHSC agents relevant to this case: Dr. Ofomata, Mr. Granat, and CMA Raper.

### A. There Is No Evidence That Dr. Ofomata or Mr. Granat Knew or Should Have Known of the Limitations of and the Accommodations Needed for Rodgers's Disabilities

According to the record before the Court, prior to his first meeting with Rodgers, Dr. Ofomata "review[ed Rodgers's] disciplinary records and use of force records for the previous two years, along with his medical and mental health records." (P-APP 128). The medical and mental health records reviewed by Dr. Ofomata included Rodgers's Skyview treatment records and other mental health records pertaining to Rodgers. Among other things, those mental health records established Rodgers's extensive treatment for mental health issues, his issues with weight loss in the past, and his medication compliance issues. (P-APP 45–54, 59–92); (P-APP 47, 51, 61, 86); (P-APP 47, 62, 68, 75, 86, 90); (P-APP 52–53, 86, 92); (P-APP 128, 130, 144, 157); (P-APP 46, 59, 61, 66, 90, 93).

On August 8, 2015, Rodgers met with and reported hearing voices to Dr. Ofomata. *See* (P-APP 130). On October 23, 2015, Dr. Ofomata generated a TDCJ Health Summary Classification Form, which indicates that Rodgers had a "PULHES" classification of "S3NR" and certain medical restrictions. *See* (P-APP 200). On the same date, he took Rodgers off of his antipsychotic medication due to compliance issues. *See* (P-APP 128, 139-141).[24] On October 23, 2015, Rodgers submitted a written I-60 request to be put back on his antipsychotic medication because he was hearing voices. *See* (P-APP 144).[25]

On November 20, 2015, Dr. Ofomata changed Rodgers's primary diagnosis from "Psychotic Disorder NOS" to intermittent-explosive disorder — a diagnosis of exclusion.[26] *Compare* (P-APP 131) *with* (P-APP 150–51). He concluded from his observations of Rodgers that no evidence of psychosis or auditory hallucinations was present. (P-APP 150–51). The change in Rodgers's diagnosis was made following Mr. Granat's cell-side visit with Rodgers on October 23, 2015. Dr. Ofomata was aware that Mr. Granat had previously visited Rodgers. (P-APP 128). Significantly, Rodgers denied experiencing any hallucinations to Mr. Granat during that visit. *See* (P-APP 157, 162). Based on Mr. Granat's observations, Dr. Ofomata concluded that Rodgers exhibited no symptoms of psychosis, mania, depression, or any other mental health problem. *See* (P-APP 161).

Regarding Mr. Granat, the record before the Court indicates that he "review[ed Rodgers's] medical records" prior to meeting with him cell-side. (P-APP 157); *see* (P-APP 160). These

---

[24] Another doctor had prescribed the antipsychotic medication to Rodgers at some point prior to August 8, 2015. *See* (P-APP 130).

[25] "Offenders can ask for help by using the Offender Request to Official (I-60) form. I-60 forms are available in living areas and in various other places on the unit." *Nunnelley v. Stephens*, No. 2:14-CV-0260, 2015 WL 7566237, at *2 n.2 (N.D. Tex. Nov. 4, 2015) (quoting *Offender Orientation Handbook* at 70 (Sept. 2015)).

[26] A diagnosis of exclusion is a diagnosis reached through a process of elimination.

medical records included Rodgers's Skyview treatment records and other mental health records pertaining to Rodgers. Mr. Granat's own treatment records pertaining to Rodgers indicate that:

- Rodgers was previously diagnosed with varying forms of psychosis and mental health illnesses, *see* (P-APP 162–63);

- Mr. Granat went to Rodgers's cell to evaluate him after receiving his written I-60 request to be put back on his antipsychotic medication because he was hearing voices, *see* (P-APP 157, 160); and

- Rodgers complained of being taken off of his antipsychotic medication to Mr. Granat on October 23, 2015. *See* (P-APP 157, 160).

All of this evidence clearly shows that Dr. Ofomata and Mr. Granat knew or should have known that Rodgers had mental disabilities given his medication compliance issues. But there is no evidence that they knew or should have known that Rodgers's mental disabilities resulted in specific limitations that required single cell recommendation or notation for additional monitoring — the accommodations discussed by Patrick. At very best, their awareness and response to Rodgers's I-60 request evinces a failure to accommodate Rodgers's disability in the manner requested by *Rodgers*. However, they do *not* evince a failure to accommodate it in the manner articulated by Patrick. This difference is crucial: to meet her summary judgment burden, Patrick must show that Dr. Ofomata and Mr. Granat failed to accommodate Rodgers's disability *in the way that she discusses*. But she has failed to do this.

Moreover, the record makes it clear that Dr. Ofomata continued to provide Rodgers with medical care by continuing to see him periodically — it just was not the medical care deemed appropriate by Patrick's experts. Although Patrick may disagree with the level of medical care provided by Dr. Ofomata, she has not shown that he denied Rodgers antipsychotic medication by reason of his disability. Rather, the evidence indicates that Dr. Ofomata took Rodgers off of his antipsychotic medication due to compliance issues and declined to place him back on it due to the

change in his diagnosis. Even if this level of medical care was not sufficient for Rodgers's medical needs, a mere failure to provide sufficient medical care does not provide a cause of action under the ADA, as stated earlier.

As for Mr. Granat, the evidence against Patrick's claim is even clearer. Rodgers denied experiencing any hallucinations to Mr. Granat on October 23, 2015. *See* (P-APP 157, 162). This, along with other cell-side observations, led Mr. Granat to conclude that Rodgers exhibited no symptoms of psychosis, mania, depression, or any other mental health problem. *See* (P-APP 161). In light of this evidence, no reasonable jury could find that Mr. Granat knew or should have known that Rodgers's mental disabilities required him to even receive the accommodation that *Rodgers* requested — being put back on antipsychotic medication — let alone the accommodation described by Patrick. And as noted in the preceding paragraph, even if Rodgers received insufficient medical care from Mr. Granat, this would be not be sufficient for a cause of action under the ADA.[27]

For all of these reasons, the Court finds that Patrick has failed to show the limitations of his disability and her specified accommodations for them were open, obvious, and apparent to Dr. Ofomata and Mr. Granat.

---

[27] It is unclear whether knowledge can be "aggregated" among employees of an entity or agency to determine whether a limitation or accommodation was "open, obvious or apparent." The Court does not need to answer this question because there is no evidence in the record of any communications between Dr. Ofomata and CMA Raper, or between Mr. Granat and CMA Raper. *See* (RAPER-APP 73) (quoting CMA Raper stating: "[W]e're not privy to any medical information, just strictly pharmacy."); (RAPER-APP 84) (quoting CMA Raper responding "[n]o" when asked if she was aware of Rodgers's diagnoses or any of his medical conditions before he died). As such, any knowledge that Dr. Ofomata or Mr. Granat may have had regarding Rodgers's treatment and serious mental health history cannot be imputed to CMA Raper. Further, Patrick has not identified any summary judgment evidence indicating shared knowledge across agencies or entities between TDCJ and TTUHSC.

### B. There Is No Evidence That CMA Raper Knew or Should Have Known of Rodgers's Disabilities, Their Resulting Limitations, or Reasonable Accommodations for Them

The Court additionally finds that Patrick has failed to raise a genuine issue of material fact as to whether Rodgers's physical disabilities were open, obvious, and apparent to CMA Raper.

Patrick has identified summary judgment evidence that:

- CMA Raper personally observed Rodgers once on January 17, 2016 — the day before Rodgers died  —  and on at least five other days in January 2016, *see, e.g.*, (RAPER-APP 44, 64, 78–80, 103–105);

- Rodgers lost approximately 23 pounds — 14% of his total bodyweight — between October 13, 2015, and January 18, 2016, and was observed to be severely emaciated by hospital medical staff, *see, e.g.*, (P-APP 14–15, 18);

- Rodgers was beaten by his cellmate five times in January 2016, the first four of which occurred prior to CMA Raper personally observing Rodgers on January 17, *see, e.g.*, (P-APP 338–341);

- in the days and weeks prior to January 17, Rodgers was immobile and bedridden due to his physical disabilities, which resulted in or contributed to his suffering from pneumonia, a bedsore, and pulmonary embolisms, or blood clots, *see, e.g.*, (P-APP 30–42);

- prior to January 17, CMA Raper expressed her concern to two different officers on two different days that Rodgers's cell was always dark, *see* (RAPER-APP 44–50); and

- on January 17, CMA Raper expressed her concern to Officer Randal that Rodgers was always on his bunk, always on his side, and always facing the wall of his cell and that his cell was always dark. *See, e.g.*, (RAPER-APP 59–60, 78–82).

TTUHSC has identified evidence on summary judgment that:

- on January 10, 2016, an officer responded to CMA Raper's concern regarding the lack of lighting in Rodgers's cell by stating that usually the inmates were workers that slept at different times and wanted their cells to be dark, *see* (RAPER-APP 44–46);

- on January 11, a second officer responded similarly to CMA Raper's concern regarding the lack of lighting in Rodgers's cell by stating that the inmates were usually workers that slept at different times and wanted their cells to be dark, stating that the unit pod lights could not be turned on while the inmates' personal cell lights could be, and by shining a flashlight into Rodgers's cell, *see* (RAPER-APP 46–49, 66);

- on January 17, a third officer — Officer Randal — responded to CMA Raper's concerns regarding Rodgers's lack of movement and the lack of lighting in Rodgers's cell by stating that he assumed that the cell was dark because Rodgers had been working, that he heard two different identification numbers and two different names when she asked for inmate identification — just a few days before Rodgers had gotten up to take his new inmate identification picture — and that TDCJ officers perform bed counts where the inmates have to get out of bed and come to the cell door, *see, e.g.*, (RAPER-APP 59, 61);

- on that day, in light of the information provided by Officer Randal, CMA Raper assumed that Rodgers was sleeping, *see* (RAPER-APP 59);

- on that day, CMA Raper could not see Rodgers's face or body due to Rodgers's bedsheets and the lack of lighting in Rodgers's cell but heard two different voices and assumed it was him talking, *see* (RAPER-APP 45, 62, 65–66, 82); and

- on that day, CMA Raper observed that Rodgers's cell seemed to be in order. *See* (RAPER-APP 63).

Given the full context of the summary judgment evidence above, there is insufficient evidence to raise a genuine issue of material fact that CMA Raper knew or should have known of Rodgers's physical or mental disabilities, their resulting limitations, and reasonable accommodations for them. First, neither Rodgers nor his cellmate communicated anything to CMA Raper regarding Rodgers's physical or mental health disabilities. Second, CMA Raper did not observe Rodgers's bodily injuries due to Rodgers's bedsheet covering his body and the lack of lighting in Rodgers's cell. She also did not observe Rodgers undergoing a mental health crisis. Third, CMA Raper's concerns regarding lack of movement from Rodgers were alleviated by explanations from Officer Randal and other correctional officers. Fourth and most importantly, CMA Raper could not even observe Rodgers's injuries at all and thus could not have known or be

expected to have known to provide the accommodations described by Patrick — additional medical care or more intensive medical care. For all of these reasons, the Court finds that Patrick has failed to show Rodgers's physical and mental disabilities, their resulting limitations, and the reasonable accommodations for them were open, obvious, and apparent to CMA Raper.[28]

\* \* \*

Patrick has failed to raise a genuine issue of material fact from the summary judgment evidence that the limitations resulting from Rodgers's disabilities and the need for reasonable accommodations for them were open, obvious, and apparent to Dr. Ofomata, Mr. Granat, CMA Raper, or any of TTUHSC's employees at the Clements Unit. Therefore, the Court GRANTS TTUHSC's motion for summary judgment, and Patrick's ADA and RA claims against TTUHSC are DISMISSED with prejudice.

## VII

The State of Texas moves for summary judgment on Patrick's ADA and RA claims against it. The State of Texas makes, *inter alia*, the following two arguments. First, it argues that to the extent Patrick seeks to impose liability on the State of Texas for the actions or omissions of TDCJ or TTUHSC, the State of Texas incorporates the arguments presented in the motions for summary judgment and briefs in support filed by those agencies. Second, it argues that to the extent Patrick seeks to impose liability on the State of Texas for its own actions or omissions, Patrick's theory of liability fails because it is neither pleaded with the requisite specificity nor supported by the summary judgment evidence.[29]

---

[28] There is no evidence in the record that Rodgers communicated anything regarding his mental disability to CMA Raper or that he ever exhibited any mental health issues in front of her.

[29] The State of Texas raises additional arguments regarding issues including the dismissal of duplicative claims against it, the lack of responsibility for provision of services by it, and sovereign immunity. Because the court ultimately concludes that the State of Texas is entitled to summary judgment on other grounds, the court declines to address those arguments. The State of Texas also argues, among other things, that it is entitled to summary judgment on Patrick's

Patrick claims that the State of Texas intentionally discriminated against Rodgers in violation of Title II of the ADA and Section 504 of the RA by failing to accommodate his known mental and physical disabilities. Specifically, she claims that the State of Texas discriminated against him by failing to accommodate these either through the actions or omissions of its agencies, namely, TDCJ and TTUHSC, or through its own actions or omissions. *See, e.g.*, (ECF No. 282 at ¶¶ 6, 92–96). She further claims that such failures were intentional. *Id.*

Patrick's first theory is entirely predicated on the notion that the State of Texas is itself responsible for the purported violations of the ADA and RA through the actions or omissions of TDCJ and TTUHSC. Because this Court has already granted summary judgment to TDCJ and TTUHSC and dismissed Patrick's ADA and RA claims against them, this theory cannot succeed.

Patrick's second theory is entirely predicated on the idea that the State of Texas is responsible for its own purported failure to prevent TDCJ and TTUHSC from violating the ADA and RA. Again, because this Court has granted summary judgment to TDCJ and TTUHSC and dismissed Patrick's ADA and RA claims against them, this theory also cannot stand.[30]

\*    \*    \*

Therefore, the Court GRANTS the State of Texas's motion for summary judgment, and Patrick's ADA and RA claims against the State of Texas are DISMISSED with prejudice.

---

Section 1983 access-to-the-courts claim against it. However, Patrick's access-to-the-courts claim against the State of Texas was previously dismissed with prejudice after Patrick conceded the claim was not viable. *See* (ECF No. 232)on.
[30] Assuming *arguendo* that Patrick's second theory is predicated on the idea that the State of Texas independently violated the ADA and RA, the Court finds that there is no competent summary judgment evidence that the State of Texas, through its own actions or omissions, failed to accommodate, or intentionally discriminated against Rodgers.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court:

- DENIES summary judgment to Officer Taylor and Officer Randal on Patrick's claims for deliberate indifference to Rodgers's safety;

- GRANTS summary judgment to Officer Taylor (ECF No. 307) and Officer Randal (ECF No. 337) on Patrick's claims against them for deliberate indifference to health, on the grounds of qualified immunity;

- GRANTS summary judgment to CMA Raper (ECF No. 323) on Patrick's claims of deliberate indifference to health against her, on the grounds of qualified immunity;

- GRANTS, in part, the TDCJ sergeants' motion (ECF No. 304) for summary judgment on the grounds of qualified immunity, with the exception that Sgt. Mogilnicki and Sgt. Burkholder are DENIED summary judgment with respect to Patrick's deliberate indifference to safety claims;

- GRANTS summary judgment to these and the other sergeants on Patrick's claims against them for deliberate indifference to health claims on the ground of qualified immunity; and

- GRANTS Warden Martin's (ECF No. 319), TDCJ (ECF No. 317), TTUHSC (ECF No. 325), and the State of Texas's (ECF No. 341) respective motions for summary judgment.

Finally, all claims for which summary judgment is granted are also DISMISSED with prejudice, and Patrick's access-to-the-courts claim against TDCJ is DISMISSED with prejudice.

**SO ORDERED.**

July 16, 2020.

_____

MATTHEW KACSMARYK
UNITED STATES DISTRICT JUDGE